# FRANKS ET AL. v. BOWMAN TRANSPORTATION CO., INC., ET AL.

No. 74–728.   Argued November 3, 1975—Decided March 24, 1976

748

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined, and in Part I of which POWELL, J., joined. BURGER, C. J., filed an opinion concurring in part and dissenting in part, *post*, p. 780. POWELL, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, J., joined, *post*, p. 781. STEVENS, J., took no part in the consideration or decision of the case.

*Morris J. Baller* argued the cause for petitioners. With him on the briefs were *Jack Greenberg, James M. Nabrit III, Barry L. Goldstein, Eric Schnapper, John R. Myer,* and *Elizabeth R. Rindskopf.*

*William M. Pate* argued the cause and filed a brief for respondent Bowman Transportation Co., Inc.

*Michael H. Gottesman* argued the cause for respondent United Steelworkers of America. With him on the joint briefs for this respondent and for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal were *Elliot Bredhoff, Robert M. Weinberg, Bernard Kleiman, Carl Frankel, Jerome A. Cooper, James W. Dorsey, J. Albert Woll,* and *Laurence Gold.**

---

*\*Gerard C. Smetana, Jerry Kronenberg, Howard L. Mocerf, Mil-*

Mr. Justice Brennan delivered the opinion of the Court.

This case presents the question whether identifiable applicants who were denied employment because of race after the effective date and in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* (1970 ed. and Supp. IV), may be awarded seniority status retroactive to the dates of their employment applications.[1]

Petitioner Franks brought this class action in the United States District Court for the Northern District of Georgia against his former employer, respondent Bowman Transportation Co., and his unions, the International Union of District 50, Allied and Technical Workers of the United States and Canada, and its local, No. 13600,[2] alleging various racially discriminatory employment practices in violation of Title VII. Petitioner Lee intervened on behalf of himself and others similarly situated alleging racially discriminatory hiring and dis-

---

*ton Smith,* and *Richard Berman* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Solicitor General Bork, Assistant Attorney General Pottinger, Mark L. Evans, Brian K. Landsberg, David L. Rose, Julia P. Cooper, Joseph T. Eddins,* and *Beatrice Rosenberg* for the United States et al.; and by *Joseph L. Rauh, Jr., John Silard, Elliott C. Lichtman, John A. Fillion, Stephen I. Schlossberg, Jordan Rossen, M. Jay Whitman,* and *Herbert L. Segal* for Local 862, United Automobile Workers.

[1] Petitioners also alleged an alternative claim for relief for violations of 42 U. S. C. § 1981. In view of our decision we have no occasion to address that claim.

[2] In 1972, the International Union of District 50 merged with the United Steelworkers of America, AFL–CIO, and hence the latter as the successor bargaining representative is the union respondent before this Court. Brief for Respondent United Steelworkers of America, AFL–CIO, and for American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae* 5.

charge policies limited to Bowman's employment of over-the-road (OTR) truck drivers. Following trial, the District Court found that Bowman had engaged in a pattern of racial discrimination in various company policies, including the hiring, transfer, and discharge of employees, and found further that the discriminatory practices were perpetrated in Bowman's collective-bargaining agreement with the unions. The District Court certified the action as a proper class action under Fed. Rule Civ. Proc. 23 (b) (2) and, of import to the issues before this Court, found that petitioner Lee represented all black applicants who sought to be hired or to transfer to OTR driving positions prior to January 1, 1972. In its final order and decree, the District Court subdivided the class represented by petitioner Lee into a class of black nonemployee applicants for OTR positions prior to January 1, 1972 (class 3), and a class of black employees who applied for transfer to OTR positions prior to the same date (class 4).

In its final judgment entered July 14, 1972, the District Court permanently enjoined the respondents from perpetuating the discriminatory practices found to exist, and, in regard to the black applicants for OTR positions, ordered Bowman to notify the members of both subclasses within 30 days of their right to priority consideration for such jobs. The District Court declined, however, to grant to the unnamed members of classes 3 and 4 any other specific relief sought, which included an award of backpay and seniority status retroactive to the date of individual application for an OTR position.

On petitioners' appeal to the Court of Appeals for the Fifth Circuit, raising for the most part claimed inadequacy of the relief ordered respecting unnamed members of the various subclasses involved, the Court of Appeals affirmed in part, reversed in part, and vacated in part. 495 F. 2d 398 (1974). The Court of Appeals

held that the District Court had exercised its discretion under an erroneous view of law insofar as it failed to award backpay to the unnamed class members of both classes 3 and 4, and vacated the judgment in that respect. The judgment was reversed insofar as it failed to award any seniority remedy to the members of class 4 who after the judgment of the District Court sought and obtained priority consideration for transfer to OTR positions.[3] As respects unnamed members of class 3—nonemployee black applicants who applied for and were denied OTR positions prior to January 1, 1972—the Court of Appeals affirmed the District Court's denial of any form of seniority relief. Only this last aspect of the Court of Appeals' judgment is before us for review under our grant of the petition for certiorari. 420 U. S. 989 (1975).

I

Respondent Bowman raises a threshold issue of mootness. The District Court found that Bowman had hired petitioner Lee, the sole-named representative of class 3, and had subsequently properly discharged him for cause,[4] and the Court of Appeals affirmed. Bowman argues that since Lee will not in any event be eligible

---

[3] In conjunction with its directions to the District Court regarding seniority relief for the members of other subclasses not involved in the issues presently confronting this Court, the Court of Appeals directed that class 4 members who transferred to OTR positions under the District Court's decree should be allowed to carry over all accumulated company seniority for all purposes in the OTR department. 495 F. 2d, at 417.

[4] The District Court determined that Lee first filed his employment application with Bowman on January 13, 1970, and was discriminatorily refused employment at that time. Lee was later hired by Bowman on September 18, 1970, after he had filed a complaint with the Equal Employment Opportunity Commission. The District Court awarded Lee $6,124.58 as backpay for the intervening period of discrimination.

for any hiring relief in favor of OTR nonemployee discriminatees, he has no personal stake in the outcome and therefore the question whether nonemployee discriminatees are entitled to an award of seniority when hired in compliance with the District Court order is moot. Bowman relies on *Sosna* v. *Iowa,* 419 U. S. 393 (1975), and *Board of School Comm'rs* v. *Jacobs,* 420 U. S. 128 (1975). That reliance is misplaced.

*Sosna* involved a challenge to a one-year residency requirement in a. state divorce statute. The District Court properly certified the action as a class action. However, before the case reached this Court, the named representative satisfied the state residency requirement (and had in fact obtained a divorce in another State). 419 U. S., at 398, and n. 7. Although the named representative no longer had a personal stake in the outcome, we held that "[w]hen the District Court certified the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by [the named representative]," *id.,* at 399, and, accordingly the "cases or controversies" requirement of Art. III of the Constitution was satisfied. *Id.,* at 402.[5]

It is true as Bowman emphasizes that *Sosna* was an instance of the "capable of repetition, yet evading review" aspect of the law of mootness. *Id.,* at 399–401. And that aspect of *Sosna* was remarked in *Board of School Comm'rs* v. *Jacobs, supra,* a case which was held to

---

[5] "There must not only be a named plaintiff who has such a case or controversy at the time the complaint is filed, and at the time the class action is certified by the District Court pursuant to Rule 23, but there must be a live controversy at the time this Court reviews the case. . . . The controversy may exist, however, between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot." *Sosna,* 419 U. S., at 402 (footnotes omitted).

be moot.[6] But nothing in our *Sosna* or *Board of School Comm'rs* opinions holds or even intimates that the fact that the named plaintiff no longer has a personal stake in the outcome of a certified class action renders the class action moot unless there remains an issue "capable of repetition, yet evading review." [7] Insofar as the concept of mootness defines constitutionally minimal conditions for the invocation of federal judicial power, its meaning and scope, as with all concepts of justiciability, must be derived from the fundamental policies informing the "cases or controversies" limitation imposed by Art. III.

> "As is so often the situation in constitutional adjudication, those two words have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government. Embodied

---

[6] In *Board of School Comm'rs* v. *Jacobs*, the named plaintiffs no longer possessed a personal stake in the outcome at the time the case reached this Court for review. As the action had not been properly certified as a class action by the District Court, we held it moot. 420 U. S., at 129.

[7] To the contrary, *Sosna*, 419 U. S., at 401 n. 10, cited with approval two Courts of Appeals decisions not involving "evading review" issues which held, in circumstances less compelling than those presented by the instant case, that Title VII claims of unnamed class members are not automatically mooted merely because the named representative is determined to be ineligible for relief for reasons peculiar to his individual claim. *Roberts* v. *Union Co.*, 487 F. 2d 387 (CA6 1973); *Moss* v. *Lane Co.*, 471 F. 2d 853 (CA4 1973). In the *Moss* case, the Court of Appeals for the Fourth Circuit followed its prior decision in *Brown* v. *Gaston County Dyeing Machine Co.*, 457 F. 2d 1377, cert. denied, 409 U. S. 982 (1972). That case involved circumstances similar to those before us. There the named representative had proved his personal § 1981 claim against his former employer but was, for reasons special to himself, determined to be ineligible for the Title VII relief sought on behalf of himself and the class of discriminatees he represented.

in the words 'cases' and 'controversies' are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government." *Flast* v. *Cohen*, 392 U. S. 83, 94–95 (1968).

There can be no question that this certified class action "clearly presented" the District Court and the Court of Appeals "with a case or controversy in every sense contemplated by Art. III of the Constitution." *Sosna, supra,* at 398. Those courts were presented with the seniority question "in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast, supra,* at 95. The only constitutional mootness question is therefore whether, with regard to the seniority issues presented, "a live controversy [remains] at the time this Court reviews the case." *Sosna, supra,* at 402.

The unnamed members of the class are entitled to the relief already afforded Lee, hiring and backpay, and thus to that extent have "such a personal stake in the outcome of the controversy [whether they are also entitled to seniority relief] as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). Given a properly certified class action, *Sosna* contemplates that mootness turns on whether, in the specific circumstances of the given case at the time it is before this Court, an adversary relationship sufficient to

fulfill this function exists.[8]  In this case, that adversary relationship obviously obtained as to unnamed class members with respect to the underlying cause of action and also continues to obtain as respects their assertion that the relief they have received in entitlement to consideration for hiring and backpay is inadequate without further award of entitlement to seniority benefits.  This becomes crystal clear upon examination of the circumstances and the record of this case.

The unnamed members of the class involved are identifiable individuals, individually named in the record. Some have already availed themselves of the hiring relief ordered by the District Court and are presently employed as OTR drivers by Bowman.  Tr. of Oral Arg. 23.  The conditions of that employment are now and so far as can be foreseen will continue to be partially a function of their status in the seniority system.  The rights of other members of the class to employment under the District Court's orders are currently the subject of further litigation in that court.  *Id.,* at 15.  No questions are raised concerning the continuing desire of any of these class members for the seniority relief presently in issue.  No questions are raised concerning the tenacity and competence of their counsel in pursuing that mode of legal relief before this Court.  It follows that there is no meaningful sense in which a "live controversy" reflecting the issues before the Court could

---

[8] Thus, the "capable of repetition, yet evading review" dimension of *Sosna* must be understood in the context of mootness as one of the policy rules often invoked by the Court "to avoid passing prematurely on constitutional questions.  Because [such] rules operate in 'cases confessedly within [the Court's] jurisdiction' . . . they find their source in policy, rather than purely constitutional, considerations." *Flast* v. *Cohen,* 392 U. S. 83, 97 (1968).  See also, *id.,* at 120 n. 8 (Harlan, J., dissenting); *Ashwander* v. *TVA,* 297 U. S. 288, 345–348 (1936) (Brandeis, J., concurring).

be found to be absent.[9]   Accordingly, Bowman's mootness argument has no merit.

## II

In affirming the District Court's denial of seniority relief to the class 3 group of discriminatees, the Court of Appeals held that the relief was barred by § 703 (h) of Title VII, 42 U. S. C. § 2000e–2 (h).   We disagree.   Section 703 (h) provides in pertinent part:

> "Notwithstanding any other provision of this title, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . ."

The Court of Appeals reasoned that a discriminatory refusal to hire "does not affect the bona fides of the seniority system.   Thus, the differences in the benefits and conditions of employment which a seniority system accords to older and newer employees is protected [by § 703 (h)] as 'not an unlawful employment practice.'" 495 F. 2d, at 417.   Significantly, neither Bowman nor the unions undertake to defend the Court of Appeals' judgment on that ground.   It is clearly erroneous.

The black applicants for OTR positions composing class 3 are limited to those whose applications were put

---

[9] Nor are there present in the instant case nonconstitutional policy considerations, n. 8, *supra,* mitigating against review by this Court at the present time.   Indeed, to "split up" the underlying case and require that the individual class members begin anew litigation on the sole issue of seniority relief would be destructive of the ends of judicial economy and would postpone indefinitely relief which under the law may already be long overdue.

in evidence at the trial.[10] The underlying legal wrong affecting them is not the alleged operation of a racially discriminatory seniority system but of a racially discriminatory hiring system. Petitioners do not ask for modification or elimination of the existing seniority system, but only for an award of the seniority status they would have individually enjoyed under the present system but for the illegal discriminatory refusal to hire. It is this context that must shape our determination as to the meaning and effect of § 703 (h).

On its face, § 703 (h) appears to be only a definitional provision; as with the other provisions of § 703, subsection (h) delineates which employment practices are illegal and thereby prohibited and which are not.[11] Section 703 (h) certainly does not expressly purport to qualify or proscribe relief otherwise appropriate under the remedial provisions of Title VII, § 706 (g), 42 U. S. C. § 2000e–5 (g), in circumstances where an illegal discriminatory act or practice is found. Further, the legislative history of § 703 (h) plainly negates its reading as limit-

---

[10] By its terms, the judgment of the District Court runs to all black applicants for OTR positions prior to January 1, 1972, and is not qualified by a limitation that the discriminatory refusal to hire must have taken place after the effective date of the Act. However, only post-Act victims of racial discrimination are members of class 3. Title VII's prohibition on racial discrimination in hiring became effective on July 2, 1965, one year after the date of its enactment. Pub. L. 88–352, §§ 716 (a)–(b), 78 Stat. 266. Petitioners sought relief in this case for identifiable applicants for OTR positions "whose applications were put in evidence at the trial." App. 20a. There were 206 unhired black applicants prior to January 1, 1972, whose written applications are summarized in the record and none of the applications relates to years prior to 1970. Id., at 52a, Table VA.

[11] See Last Hired, First Fired Seniority, Layoffs, and Title VII: Questions of Liability and Remedy, 11 Col. J. L. & Soc. Prob. 343, 376, 378 (1975).

ing or qualifying the relief authorized under § 706 (g). The initial bill reported by the House Judiciary Committee as H. R. 7152 [12] and passed by the full House on February 10, 1964,[13] did not contain § 703 (h). Neither the House bill nor the majority Judiciary Committee Report [14] even mentioned the problem of seniority. That subject thereafter surfaced during the debate of the bill in the Senate. This debate prompted Senators Clark and Case to respond to criticism that Title VII would destroy existing seniority systems by placing an interpretive memorandum in the Congressional Record. The memorandum stated: "Title VII would have no effect on established seniority rights. Its effect is prospective and not retrospective." 110 Cong. Rec. 7213 (1964).[15] Senator Clark also placed in the Congressional Record a Justice Department statement concerning Title VII which stated: "[I]t has been asserted that Title VII would undermine vested rights of seniority. This is not

---

[12] See H. R. Rep. No. 914, 88th Cong., 1st Sess. (1963).

[13] 110 Cong. Rec. 2804 (1964).

[14] H. R. Rep. No. 914, supra.

[15] The full text of the memorandum pertaining to seniority states: "Title VII would have no effect on established seniority rights. Its effect is prospective and not retrospective. Thus, for example, if a business has been discriminating in the past and as a result has an all-white working force, when the title comes into effect the employer's obligation would be simply to fill future vacancies on a nondiscriminatory basis. He would not be obliged—or indeed, permitted—to fire whites in order to hire Negroes, or to prefer Negroes for future vacancies, or, once Negroes are hired, to give them special seniority rights at the expense of the white workers hired earlier. (However, where waiting lists for employment or training are, prior to the effective date of the title, maintained on a discriminatory basis, the use of such lists after the title takes effect may be held an unlawful subterfuge to accomplish discrimination.)"

correct. Title VII would have no effect on seniority rights existing at the time it takes effect." *Id.*, at 7207.[16] Several weeks thereafter, following several in-

---

[16] The full text of the statement pertinent to seniority reads:

"First, it has been asserted that title VII would undermine vested rights of seniority. This is not correct. Title VII would have no effect on seniority rights existing at the time it takes effect. If, for example, a collective bargaining contract provides that in the event of layoffs, those who were hired last must be laid off first, such a provision would not be affected in the least by title VII. This would be true even in the case where owing to discrimination prior to the effective date of the title, white workers had more seniority than Negroes. Title VII is directed at discrimination based on race, color, religion, sex, or national origin. It is perfectly clear that when a worker is laid off or denied a chance for promotion because under established seniority rules he is 'low man on the totem pole' he is not being discriminated against because of his race. Of course, if the seniority rule itself is discriminatory, it would be unlawful under title VII. If a rule were to state that all Negroes must be laid off before any white man, such a rule could not serve as the basis for a discharge subsequent to the effective date of the title. I do not know how anyone could quarrel with such a result. But, in the ordinary case, assuming that seniority rights were built up over a period of time during which Negroes were not hired, these rights would not be set aside by the taking effect of title VII. Employers and labor organizations would simply be under a duty not to discriminate against Negroes because of their race. Any differences in treatment based on established seniority rights would not be based on race and would not be forbidden by the title." 110 Cong. Rec. 7207 (1964).

Senator Clark also introduced into the Congressional Record a set of answers to a series of questions propounded by Senator Dirksen. Two of these questions and answers are pertinent to the issue of seniority:

"Question. Would the same situation prevail in respect to promotions, when that management function is governed by a labor contract calling for promotions on the basis of seniority? What of dismissals? Normally, labor contracts call for 'last hired, first fired.' If the last hired are Negroes, is the employer discriminating if his

formal conferences among the Senate leadership, the House leadership, the Attorney General and others, see Vaas, Title VII: Legislative History, 7 B. C. Ind. & Com. L. Rev. 431, 445 (1966), a compromise substitute bill prepared by Senators Mansfield and Dirksen, Senate majority and minority leaders respectively, containing § 703 (h) was introduced on the Senate floor.[17] Although the Mansfield-Dirksen substitute bill, and hence § 703 (h), was not the subject of a committee report, see generally Vaas, *supra*, Senator Humphrey, one of the informal conferees, later stated during debate on the substitute that § 703 (h) was not designed to alter the meaning of Title VII generally but rather "merely clarifies its present intent and effect." 110 Cong. Rec. 12723 (1964). Accordingly, whatever the exact meaning and scope of § 703 (h) in light of its unusual legislative history and the absence of the usual legislative materials, see Vaas, *supra*, at 457–458, it is apparent that the thrust of the section is directed toward defining what is and what is not an illegal discriminatory practice in instances in which the post-Act operation of a seniority system is challenged as perpetuating the effects of discrimination occurring prior to the effective date of the Act. There is no indication in the legislative materials that § 703 (h) was intended to modify or re-

---

contract requires they be first fired and the remaining employees are white?

"Answer. Seniority rights are in no way affected by the bill. If under a 'last hired, first fired' agreement a Negro happens to be the 'last hired,' he can still be 'first fired' as long as it is done because of his status as 'last hired' and not because of his race.

"Question. If an employer is directed to abolish his employment list because of discrimination what happens to seniority?

"Answer. The bill is not retroactive, and it will not require an employer to change existing seniority lists." *Id.*, at 7217.

[17] *Id.*, at 11926, 11931.

strict relief otherwise appropriate once an illegal discriminatory practice occurring after the effective date of the Act is proved—as in the instant case, a discriminatory refusal to hire. This accords with the apparently unanimous view of commentators, see Cooper & Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv. L. Rev. 1598, 1632 (1969); Stacy, Title VII Seniority Remedies in a Time of Economic Downturn, 28 Vand. L. Rev. 487, 506 (1975).[18] We therefore hold that the Court of Appeals erred in concluding that, as a matter of law, § 703 (h) barred the award of seniority relief to the unnamed class 3 members.

## III

There remains the question whether an award of seniority relief is appropriate under the remedial provisions of Title VII, specifically, § 706 (g).[19]

---

[18] Cf. Gould, Employment Security, Seniority and Race: The Role of Title VII of the Civil Rights Act of 1964, 13 How. L. J. 1, 8–9, and n. 32 (1967); see also *Jurinko* v. *Edwin L. Wiegand Co.,* 477 F. 2d 1038 (CA3), vacated and remanded on other grounds, 414 U. S. 970 (1973), wherein the court awarded back seniority in a case of discriminatory hiring after the effective date of Title VII without any discussion of the impact of § 703 (h) on the propriety of such a remedy.

[19] Section 706 (g) of Title VII, 42 U. S. C. § 2000e–5 (g) (1970 ed., Supp. IV), provides:

"If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems

We begin by repeating the observation of earlier decisions that in enacting Title VII of the Civil Rights Act of 1964, Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin, *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 44 (1974); *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 800 (1973); *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 429–430 (1971), and ordained that its policy of outlawing such discrimination should have the "highest priority," *Alexander, supra,* at 47; *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400, 402 (1968). Last Term's *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405 (1975), consistently with the congressional plan, held that one of the central purposes of Title VII is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.,* at 418. To effectuate this "make whole" objective, Congress in § 706 (g) vested broad equitable discretion in the federal courts to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate." The legislative history sup-

appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3 (a) of this title."

porting the 1972 amendments of § 706 (g) of Title VII [20] affirms the breadth of this discretion. "The provisions of [§ 706 (g)] are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. . . . [T]he Act is intended to make the victims of unlawful employment discrimination whole, and . . . the attainment of this objective . . . requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." Section-by-Section Analysis of H. R. 1746, accompanying the Equal Employment Opportunity Act of 1972—Conference Report, 118 Cong. Rec. 7166, 7168 (1972). This is emphatic confirmation that federal courts are empowered to fashion such relief as the particular circumstances of a case may require to effect restitution, making whole insofar as possible the victims of racial discrimination in hiring.[21] Adequate relief may well be

[20] Equal Employment Opportunity Act of 1972, 86 Stat. 103, amending 42 U. S. C. § 2000e et seq.

[21] It is true that backpay is the only remedy specifically mentioned in § 706 (g). But to draw from this fact and other sections of the statute, post, at 789–793, any implicit statement by Congress that seniority relief is a prohibited, or at least less available, form of remedy is not warranted. Indeed, any such contention necessarily disregards the extensive legislative history underlying the 1972 amendments to Title VII. The 1972 amendments added the phrase speaking to "other equitable relief" in § 706 (g). The Senate Report manifested an explicit concern with the "earnings gap" presently existing between black and white employees in American society. S. Rep. No. 92–415, p. 6 (1971). The Reports of both Houses of Congress indicated that "rightful place" was the intended objective of Title VII and the relief accorded thereunder. Ibid.; H. R. Rep. No. 92–238, p. 4 (1971). As indicated, infra, at 767–768, and n. 28, rightful-place seniority, implicating an employee's

denied in the absence of a seniority remedy slotting the victim in that position in the seniority system that would have been his had he been hired at the time of

---

*future* earnings, job security, and advancement prospects, is absolutely essential to obtaining this congressionally mandated goal.

The legislative history underlying the 1972 amendments completely answers the argument that Congress somehow intended seniority relief to be less available in pursuit of this goal. In explaining the need for the 1972 amendments, the Senate Report stated:

"Employment discrimination as viewed today is a . . . complex and pervasive phenomenon. Experts familiar with the subject now generally describe the problem in terms of 'systems' and 'effects' rather than simply intentional wrongs, and the literature on the subject is replete with discussions of, for example, the mechanics of seniority and lines of progression, perpetuation of the present effect of pre-act discriminatory practices through various institutional devices, and testing and validation requirements." S. Rep. No. 92–415, *supra*, at 5.

See also H. R. Rep. No. 92–238, *supra*, at 8. In the context of this express reference to seniority, the Reports of both Houses cite with approval decisions of the lower federal courts which granted forms of retroactive "rightful place" seniority relief. S. Rep. No. 92–415, *supra*, at 5 n. 1; H. R. Rep. No. 92–238, *supra*, at 8 n. 2. (The dissent, *post*, at 796–797, n. 18, would distinguish these lower federal court decisions as not involving instances of discriminatory *hiring*. Obviously, however, the concern of the entire thrust of the dissent—the impact of rightful-place seniority upon the expectations of other employees—is in no way a function of the specific type of illegal discriminatory practice upon which the judgment of liability is predicated.) Thereafter, in language that could hardly be more explicit, the analysis accompanying the Conference Report stated:

"In any area where the new law does not address itself, or in any areas where a specific contrary intention is not indicated, it was assumed *that the present case law as developed by the courts would continue to govern the applicability and construction of Title VII."* Section-By-Section Analysis of H. R. 1746, accompanying The Equal Employment Opportunity Act of 1972—Conference Report, 118 Cong. Rec. 7166 (1972) (emphasis added).

his application. It can hardly be questioned that ordinarily such relief will be necessary to achieve the "make-whole" purposes of the Act.

Seniority systems and the entitlements conferred by credits earned thereunder are of vast and increasing importance in the economic employment system of this Nation. S. Slichter, J. Healy, & E. Livernash, The Impact of Collective Bargaining on Management 104–115 (1960). Seniority principles are increasingly used to allocate entitlements to scarce benefits among competing employees ("competitive status" seniority) and to compute noncompetitive benefits earned under the contract of employment ("benefit" seniority). *Ibid.* We have already said about "competitive status" seniority that it "has become of overriding importance, and one of its major functions is to determine who gets or who keeps an available job." *Humphrey* v. *Moore,* 375 U. S. 335, 346–347 (1964). "More than any other provision of the collective[-bargaining] agreement ... seniority affects the economic security of the individual employee covered by its terms." Aaron, Reflections on the Legal Nature and Enforceability of Seniority Rights, 75 Harv. L. Rev. 1532, 1535 (1962). "Competitive status" seniority also often plays a broader role in modern employment systems, particularly systems operated under collective-bargaining agreements:

> "Included among the benefits, options, and safeguards affected by competitive status seniority, are not only promotion and layoff, but also transfer, demotion, rest days, shift assignments, prerogative in scheduling vacation, order of layoff, possibilities of lateral transfer to avoid layoff, 'bumping' possibilities in the face of layoff, order of recall, training opportunities, working conditions, length of layoff endured without reducing seniority, length of layoff

recall rights will withstand, overtime opportunities, parking privileges, and, in one plant, a preferred place in the punch-out line." Stacy, 28 Vand. L. Rev., *supra*, at 490 (footnotes omitted).

Seniority standing in employment with respondent Bowman, computed from the departmental date of hire, determines the order of layoff and recall of employees.[22] Further, job assignments for OTR drivers are posted for competitive bidding and seniority is used to determine the highest bidder.[23] As OTR drivers are paid on a per-mile basis,[24] earnings are therefore to some extent a function of seniority. Additionally, seniority computed from the company date of hire determines the length of an employee's vacation[25] and pension benefits.[26] Obviously merely to require Bowman to hire the class 3 victim of discrimination falls far short of a "make whole" remedy.[27] A concomitant award of the seniority credit he presumptively would have earned but for the wrongful treatment would also seem necessary in the absence of justification for denying that relief. Without an award of seniority dating from the time when he was discriminatorily refused employment, an indi-

---

[22] App. 46a–50a.

[23] *Ibid.*

[24] 2 Record 161.

[25] App. 47a, 51a.

[26] 2 Record 169.

[27] Further, at least in regard to "benefit"-type seniority such as length of vacation leave and pension benefits in the instant case, any general bar to the award of retroactive seniority for victims of illegal hiring discrimination serves to undermine the mutually reinforcing effect of the dual purposes of Title VII; it reduces the restitution required of an employer at such time as he is called upon to account for his discriminatory actions perpetrated in violation of the law. See *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 417–418 (1975).

vidual who applies for and obtains employment as an OTR driver pursuant to the District Court's order will never obtain his rightful place in the hierarchy of seniority according to which these various employment benefits are distributed. He will perpetually remain subordinate to persons who, but for the illegal discrimination, would have been in respect to entitlement to these benefits his inferiors.[28]

The Court of Appeals apparently followed this reasoning in holding that the District Court erred in not granting seniority relief to class 4 Bowman employees who were discriminatorily refused transfer to OTR positions. Yet the class 3 discriminatees in the absence of a comparable seniority award would also remain subordinated in the seniority system to the class 4 discriminatees. The distinction plainly finds no support anywhere in Title VII or its legislative history. Settled law dealing with the related "twin" areas of discriminatory hiring and discharges violative of the National Labor Relations Act, 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.*, provides a persuasive analogy. "[I]t would indeed be surprising if Congress gave a remedy for the one which it denied for the other."

---

[28] Accordingly, it is clear that the seniority remedy which petitioners seek does not concern only the "make whole" purposes of Title VII. The dissent errs in treating the issue of seniority relief as implicating only the "make whole" objective of Title VII and in stating that "Title VII's 'primary objective' of eradicating discrimination is not served at all . . . ." *Post,* at 788. Nothing could be further from reality—the issue of seniority relief cuts to the very heart of Title VII's primary objective of eradicating present and future discrimination in a way that backpay, for example, can never do. "[S]eniority, after all, is a right which a worker exercises in each job movement in the future, rather than a simple one-time payment for the past." Poplin, Fair Employment in a Depressed Economy: The Layoff Problem, 23 U. C. L. A. L. Rev. 177, 225 (1975).

*Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 187 (1941). For courts to differentiate without justification between the classes of discriminatees "would be a differentiation not only without substance but in defiance of that against which the prohibition of discrimination is directed." *Id.,* at 188.

Similarly, decisions construing the remedial section of the National Labor Relations Act, § 10 (c), 29 U. S. C. § 160 (c)—the model for § 706 (g), *Albemarle Paper,* 422 U. S., at 419 [29]—make clear that remedies constituting authorized "affirmative action" include an award of seniority status, for the thrust of "affirmative action" redressing the wrong incurred by an unfair labor practice is to make "the employees whole, and thus restor[e] the economic status quo that would have obtained but for the company's wrongful [act]." *NLRB* v. *Rutter-Rex Mfg. Co.,* 396 U. S. 258, 263 (1969). The task of the NLRB in applying § 10 (c) is "to take measures designed to recreate the conditions and relationships that would have been had there been no unfair labor practice." *Carpenters* v. *NLRB,* 365 U. S. 651, 657 (1961) (Harlan, J., concurring). And the NLRB has often required that the hiring of employees who have been discriminatorily refused employment be accompanied by an award of seniority equivalent to that which

---

[29] To the extent that there is a difference in the wording of the respective provisions, § 706 (g) grants, if anything, broader discretionary powers than those granted the National Labor Relations Board. Section 10 (c) of the NLRA authorizes "such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter," 29 U. S. C. § 160 (c), whereas § 706 (g) as amended in 1972 authorizes "such affirmative action as may be appropriate, which may include, *but is not limited to,* reinstatement *or hiring* of employees, with or without back pay . . . , *or any other equitable relief as the court deems appropriate."* 42 U. S. C. § 2000e–5 (g) (1970 ed., Supp. IV) (emphasis added).

they would have enjoyed but for the illegal conduct. See, *e. g.*, *In re Phelps Dodge Corp.*, 19 N. L. R. B. 547, 600, and n. 39, 603–604 (1940), modified on other grounds, 313 U. S. 177 (1941) (ordering persons discriminatorily refused employment hired "without prejudice to their seniority or other rights and privileges"); *In re Nevada Consolidated Copper Corp.*, 26 N. L. R. B. 1182, 1235 (1940), enforced, 316 U. S. 105 (1942) (ordering persons discriminatorily refused employment hired with "any seniority or other rights and privileges they would have acquired, had the respondent not unlawfully discriminated against them"). Plainly the "affirmative action" injunction of § 706 (g) has no lesser reach in the district courts. "Where racial discrimination is concerned, 'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *Albemarle Paper, supra,* at 418.

## IV

We are not to be understood as holding that an award of seniority status is requisite in all circumstances. The fashioning of appropriate remedies invokes the sound equitable discretion of the district courts. Respondent Bowman attempts to justify the District Court's denial of seniority relief for petitioners as an exercise of equitable discretion, but the record is its own refutation of the argument.

*Albemarle Paper, supra,* at 416, made clear that discretion imports not the court's "'inclination, but . . . its judgment; and its judgment is to be guided by sound legal principles.'" Discretion is vested not for purposes of "limit[ing] appellate review of trial courts, or . . . invit[ing] inconsistency and caprice," but rather to allow the most complete achievement of the objectives

of Title VII that is attainable under the facts and circumstances of the specific case. 422 U. S., at 421. Accordingly the District Court's denial of any form of seniority remedy must be reviewed in terms of its effect on the attainment of the Act's objectives under the circumstances presented by this record. No less than with the denial of the remedy of backpay, the denial of seniority relief to victims of illegal racial discrimination in hiring is permissible "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Ibid.*

The District Court stated two reasons for its denial of seniority relief for the unnamed class members.[30] The first was that those individuals had not filed administrative charges under the provisions of Title VII with the Equal Employment Opportunity Commission and therefore class relief of this sort was not appropriate. We rejected this justification for denial of class-based relief in the context of backpay awards in *Albemarle Paper,* and for the same reasons reject it here. This justification for denying class-based relief in Title VII suits has been unanimously rejected by the courts of appeals, and Congress ratified that construction by the 1972 amendments. *Albemarle Paper, supra,* at 414 n. 8.

The second reason stated by the District Court was that such claims "presuppose a vacancy, qualification,

---

[30] Since the Court of Appeals concluded that an award of retroactive seniority to the unnamed members of class 3 was barred by § 703 (h), a conclusion which we today reject, the court did not address specifically the District Court's stated reasons for refusing the relief. The Court of Appeals also stated, however, that the District Court did not "abuse its discretion" in refusing such relief, 495 F. 2d 398, 418 (1974), and we may therefore appropriately review the validity of the District Court's reasons.

and performance by every member. There is no evidence on which to base these multiple conclusions." Pet. for Cert. A54. The Court of Appeals rejected this reason insofar as it was the basis of the District Court's denial of backpay, and of its denial of retroactive seniority relief to the unnamed members of class 4. We hold that it is also an improper reason for denying seniority relief to the unnamed members of class 3.

We read the District Court's reference to the lack of evidence regarding a "vacancy, qualification, and performance" for every individual member of the class as an expression of concern that some of the unnamed class members (unhired black applicants whose employment applications were summarized in the record) may not in fact have been actual victims of racial discrimination. That factor will become material however only when those persons reapply for OTR positions pursuant to the hiring relief ordered by the District Court. Generalizations concerning such individually applicable evidence cannot serve as a justification for the denial of relief to the entire class. Rather, at such time as individual class members seek positions as OTR drivers, positions for which they are presumptively entitled to priority hiring consideration under the District Court's order,[31] evidence that particular individuals were not in fact victims of racial discrimination will be material. But petitioners here have carried their burden of demonstrating the existence of a discriminatory hiring pattern and practice by the respondents and, therefore, the burden will be upon respondents to prove that individuals who reapply were not in fact victims of previous hiring discrimination.

---

[31] The District Court order is silent as to whether applicants for OTR positions who were previously discriminatorily refused employment must be presently qualified for those positions in order to be eligible for priority hiring under that order. The Court of Appeals, however, made it plain that they must be. *Id.*, at 417. We agree.

Cf. *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 802 (1973); *Baxter* v. *Savannah Sugar Rfg. Corp.*, 495 F. 2d 437, 443–444 (CA5), cert. denied, 419 U. S. 1033 (1974).[32]  Only if this burden is met may retroactive seniority—if otherwise determined to be an appropriate form of relief under the circumstances of the particular case—be denied individual class members.

Respondent Bowman raises an alternative theory of justification.  Bowman argues that an award of retroactive seniority to the class of discriminatees will conflict with the economic interests of other Bowman employees. Accordingly, it is argued, the District Court acted within its discretion in denying this form of relief as an attempt to accommodate the competing interests of the various groups of employees.[33]

---

[32] Thus Bowman may attempt to prove that a given individual member of class 3 was not in fact discriminatorily refused employment as an OTR driver in order to defeat the individual's claim to seniority relief as well as any other remedy ordered for the class generally.  Evidence of a lack of vacancies in OTR positions at the time the individual application was filed, or evidence indicating the individual's lack of qualification for the OTR positions—under nondiscriminatory standards *actually applied* by Bowman to individuals who were in fact hired—would of course be relevant.  It is true, of course, that obtaining the third category of evidence with which the District Court was concerned—what the individual discriminatee's job performance would have been but for the discrimination—presents great difficulty.  No reason appears, however, why the victim rather than the perpetrator of the illegal act should bear the burden of proof on this issue.

[33] Even by its terms, this argument could apply only to the award of retroactive seniority for purposes of "competitive status" benefits.  It has no application to a retroactive award for purposes of "benefit" seniority—extent of vacation leave and pension benefits. Indeed, the decision concerning the propriety of this latter type of seniority relief is analogous, if not identical, to the decision concerning an award of backpay to an individual discriminatee hired pursuant to an order redressing previous employment discrimination.

We reject this argument for two reasons. First, the District Court made no mention of such considerations in its order denying the seniority relief. As we noted in *Albemarle Paper,* 422 U. S., at 421 n. 14, if the district court declines, due to the peculiar circumstances of the particular case, to award relief generally appropriate under Title VII, "[i]t is necessary . . . that . . . it carefully articulate its reasons" for so doing. Second, and more fundamentally, it is apparent that denial of seniority relief to identifiable victims of racial discrimination on the sole ground that such relief diminishes the expectations of other, arguably innocent, employees would if applied generally frustrate the central "make whole" objective of Title VII. These conflicting interests of other employees will, of course, always be present in instances where some scarce employment benefit is distributed among employees on the basis of their status in the seniority hierarchy. But, as we have said, there is nothing in the language of Title VII, or in its legislative history, to show that Congress intended generally to bar this form of relief to victims of illegal discrimination, and the experience under its remedial model in the National Labor Relations Act points to the contrary.[34] Accord-

---

[34] With all respect, the dissent does not adequately treat with and fails to distinguish, *post,* at 796–799, the standard practice of the National Labor Relations Board granting retroactive seniority relief under the National Labor Relations Act to persons discriminatorily discharged or refused employment in violation of the Act. The Court in *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 196 (1941), of course, made reference to "restricted judicial review" as that case arose in the context of review of the policy determinations of an independent administrative agency, which are traditionally accorded a wide-ranging discretion under accepted principles of judicial review. "Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion." *Id.,* at 194. As we made clear in *Albemarle Paper,* however, the pertinent point is that in utilizing the NLRA as the remedial model for Title VII, reference

ingly, we find untenable the conclusion that this form of relief may be denied merely because the interests of other employees may thereby be affected. "If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed." *United States* v. *Bethlehem Steel Corp.*, 446 F. 2d 652, 663 (CA2 1971).[35]

---

must be made to actual operation and experience as it has evolved in administering the Act. *E. g.*, "We may assume that Congress was aware that the Board, since its inception, has awarded backpay as a matter of course." 422 U. S., at 419–420. "[T]he Board has from its inception pursued 'a practically uniform policy with respect to these orders requiring affirmative action.'" *Id.*, at 420 n. 12.

The dissent has cited no case, and our research discloses none, wherein the Board has ordered hiring relief and yet withheld the remedy of retroactive seniority status. Indeed, the Court of Appeals for the First Circuit has noted that a Board order requiring hiring relief "without prejudice to . . . seniority and other rights and privileges" is "language . . . in the standard form which has long been in use by the Board." *NLRB* v. *Draper Corp.*, 159 F. 2d 294, 296–297, and n. 1 (1947). The Board "routinely awards both back pay and retroactive seniority in hiring discrimination cases." Poplin, *supra*, n. 28, at 223. See also Edwards & Zaretsky, Preferential Remedies for Employment Discrimination, 74 Mich. L. Rev. 1, 45 n. 224 (1975) (a "common remedy"); Last Hired, First Fired Seniority, Layoffs and Title VII, *supra*, n. 11, at 377 ("traditionally and uniformly required"). This also is a "presumption" in favor of this form of seniority relief. If victims of racial discrimination are under Title VII to be treated differently and awarded less protection than victims of unfair labor practice discrimination under the NLRA, some persuasive justification for such disparate treatment should appear. That no justification exists doubtless explains the position of every union participant in the proceedings before the Court in the instant case arguing for the conclusion we have reached.

[35] See also *Vogler* v. *McCarty, Inc.*, 451 F. 2d 1236, 1238–1239 (CA5 1971):

"Adequate protection of Negro rights under Title VII may necessi-

With reference to the problems of fairness or equity respecting the conflicting interests of the various groups of employees, the relief which petitioners seek is only seniority status retroactive to the date of individual application, rather than some form of arguably more complete relief.[36] No claim is asserted that nondiscriminatee employees holding OTR positions they would not have obtained but for the illegal discrimination should be deprived of the seniority status they have earned. It is therefore clear that even if the seniority relief petitioners seek is awarded, most if not all discriminatees who actually obtain OTR jobs under the court order will not truly be restored to the actual seniority that would have existed in the absence of the illegal discrimination. Rather, most discriminatees even under an award of retroactive seniority status will still remain subordinated in the hierarchy to a position inferior to that of a greater total number of employees than would have been the case in the absence of dis-

---

tate, as in the instant case, some adjustment of the rights of white employees. The Court must be free to deal equitably with conflicting interests of white employees in order to shape remedies that will most effectively protect and redress the rights of the Negro victims of discrimination."

[36] Another countervailing factor in assessing the expected impact on the interests of other employees actually occasioned by an award of the seniority relief sought is that it is not probable in instances of class-based relief that all of the victims of the past racial discrimination in hiring will actually apply for and obtain the prerequisite hiring relief. Indeed, in the instant case, there appear in the record the rejected applications of 166 black applicants who claimed at the time of application to have had the necessary job qualifications. However, the Court was informed at oral argument that only a small number of those individuals have to this date actually been hired pursuant to the District Court's order ("five, six, seven, something in that order"), Tr. of Oral Arg. 23, although ongoing litigation may ultimately determine more who desire the hiring relief and are eligible for it. *Id.,* at 15.

crimination. Therefore, the relief which petitioners seek, while a more complete form of relief than that which the District Court accorded, in no sense constitutes "complete relief."[37] Rather, the burden of the past discrimination in hiring is with respect to competitive status benefits divided among discriminatee and nondiscriminatee employees under the form of relief sought. The dissent criticizes the Court's result as not sufficiently cognizant that it will "directly implicate the rights and expectations of perfectly innocent employees." *Post*, at 788. We are of the view, however, that the result which we reach today—which, standing alone,[38] establishes that a sharing of the burden of the past discrimination is presumptively necessary—is entirely consistent with any fair characterization of equity jurisdiction,[39] particu-

---

[37] In no way can the remedy established as presumptively necessary be characterized as "total restitution," *post*, at 791 n. 9, or as deriving from an "absolutist conception of 'make whole'" relief. *Post*, at 791.

[38] In arguing that an award of the seniority relief established as presumptively necessary does nothing to place the burden of the past discrimination on the wrongdoer in most cases—the employer—the dissent of necessity addresses issues not presently before the Court. Further remedial action by the district courts, having the effect of shifting to the employer the burden of the past discrimination in respect of competitive-status benefits, raises such issues as the possibility of an injunctive "hold harmless" remedy respecting all affected employees in a layoff situation, Brief for Local 862, United Automobile Workers, as *Amicus Curiae*, the possibility of an award of monetary damages (sometimes designated "front pay") in favor of each employee and discriminatee otherwise bearing some of the burden of the past discrimination, *ibid.*; and the propriety of such further remedial action in instances wherein the union has been adjudged a participant in the illegal conduct. Brief for United States et al. as *Amici Curiae*. Such issues are not presented by the record before us, and we intimate no view regarding them.

[39] " 'The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private

larly when considered in light of our traditional view that
"[a]ttainment of a great national policy . . . must not be
confined within narrow canons for equitable relief
deemed suitable by chancellors in ordinary private con-
troversies." *Phelps Dodge Corp.* v. *NLRB,* 313 U. S.,
at 188.

Certainly there is no argument that the award
of retroactive seniority to the victims of hiring discrim-
ination in any way deprives other employees of inde-
feasibly vested rights conferred by the employment
contract. This Court has long held that employee ex-
pectations arising from a seniority system agreement may
be modified by statutes furthering a strong public policy
interest.[40] *Tilton* v. *Missouri Pacific R. Co.,* 376 U. S.
169 (1964) (construing §§ 9 (c)(1) and 9 (c)(2) of the
Universal Military Training and Service Act, 1948, 50
U. S. C. App. §§ 459 (c)(1) and (2), which provided that
a re-employed returning veteran should enjoy the senior-
ity status he would have acquired but for his absence in
military service); *Fishgold* v. *Sullivan Drydock & Repair
Corp.,* 328 U. S. 275 (1946) (construing the comparable
provision of the Selective Training and Service Act of
1940). The Court has also held that a collective-bar-
gaining agreement may go further, enhancing the senior-
ity status of certain employees for purposes of furthering
public policy interests beyond what is required by statute,
even though this will to some extent be detrimental to

claims.'" "'Moreover, . . . equitable remedies are a special blend
of what is necessary, what is fair, and what is workable . . . .

"'In equity, as nowhere else, courts eschew rigid absolutes and
look to the practical realities and necessities inescapably involved
in reconciling competing interests. . . .'" *Post,* at 789–790.

[40] "[C]laims under Title VII involve the vindication of a major
public interest . . . ." Section-By-Section Analysis of H. R. 1746,
accompanying the Equal Employment Opportunity Act of 1972—
Conference Report, 118 Cong. Rec. 7166, 7168 (1972).

the expectations acquired by other employees under the previous seniority agreement. *Ford Motor Co.* v. *Huffman*, 345 U. S. 330 (1953). And the ability of the union and employer voluntarily to modify the seniority system to the end of ameliorating the effects of past racial discrimination, a national policy objective of the "highest priority," is certainly no less than in other areas of public policy interests. *Pellicer* v. *Brotherhood of Ry. & S. S. Clerks*, 217 F. 2d 205 (CA5 1954), cert. denied, 349 U. S. 912 (1955). See also Cooper & Sobol, 82 Harv. L. Rev., at 1605.

## V

In holding that class-based seniority relief for identifiable victims of illegal hiring discrimination is a form of relief generally appropriate under § 706 (g), we do not in any way modify our previously expressed view that the statutory scheme of Title VII "implicitly recognizes that there may be cases calling for one remedy but not another, and—owing to the structure of the federal judiciary—these choices are, of course, left in the first instance to the district courts." *Albemarle Paper*, 422 U. S., at 416. Circumstances peculiar to the individual case may, of course, justify the modification or withholding of seniority relief for reasons that would not if applied generally undermine the purposes of Title VII.[41]   In the

---

[41] Accordingly, to no "significant extent" do we "[strip] the district courts of [their] equity powers." *Post*, at 786. Rather our holding is that in exercising their equitable powers, district courts should take as their starting point the presumption in favor of rightful-place seniority relief, and proceed with further legal analysis from that point; and that such relief may not be denied on the abstract basis of adverse impact upon interests of other employees but rather only on the basis of unusual adverse impact arising from facts and circumstances that would not be generally found in Title VII cases. To hold otherwise would be to shield "inconsisten[t] and capri[cious]" denial of such relief from "thorough appellate review." *Albemarle Paper*, 422 U. S., at 421, 416.

instant case it appears that all new hirees establish seniority only upon completion of a 45-day probationary period, although upon completion seniority is retroactive to the date of hire. Certainly any seniority relief ultimately awarded by the District Court could properly be cognizant of this fact. *Amici* and the respondent union point out that there may be circumstances where an award of full seniority should be deferred until completion of a training or apprenticeship program, or other preliminaries required of all new hirees.[42] We do not undertake to delineate all such possible circumstances here. Any enumeration must await particular cases and be determined in light of the trial courts' "keener appreciation" of peculiar facts and circumstances. *Albemarle Paper, supra,* at 421–422.

Accordingly, the judgment of the Court of Appeals affirming the District Court's denial of seniority relief to class 3 is reversed, and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE BURGER, concurring in part and dissenting in part.

I agree generally with MR. JUSTICE POWELL, but I would stress that although retroactive benefit-type seniority relief may sometimes be appropriate and equitable, competitive-type seniority relief at the expense of wholly

---

[42] Brief for United States et al. as *Amici Curiae* 26; Brief for Respondent United Steelworkers of America, AFL–CIO, and for American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae* 28 n. 32.

innocent employees can rarely, if ever, be equitable if that term retains traditional meaning. More equitable would be a monetary award to the person suffering the discrimination. An award such as "front pay" could replace the need for competitive-type seniority relief. See, *ante,* at 777 n. 38. Such monetary relief would serve the dual purpose of deterring wrongdoing by the employer or union—or both—as well as protecting the rights of innocent employees. In every respect an innocent employee is comparable to a "holder-in-due-course" of negotiable paper or a bona fide purchaser of property without notice of any defect in the seller's title. In this setting I cannot join in judicial approval of "robbing Peter to pay Paul."

I would stress that the Court today does not foreclose claims of employees who might be injured by this holding from securing equitable relief on their own behalf.

MR. JUSTICE POWELL, with whom MR. JUSTICE REHN-QUIST joins, concurring in part and dissenting in part.

I agree that this controversy is not moot, and that in the context of a duly certified class action the "capable of repetition, yet evading review" criterion discussed last Term in *Sosna* v. *Iowa,* 419 U. S. 393 (1975), is only a factor in our discretionary decision whether to reach the merits of an issue, rather than an Art. III "case or controversy" requirement. I therefore concur in Part I of the Court's opinion.

I also agree with Part II of the opinion insofar as it determines the "thrust" of § 703 (h) of Title VII to be the insulation of an otherwise bona fide seniority system from a challenge that it amounts to a discriminatory practice because it perpetuates the effects of pre-Act discrimination. *Ante,* at 761. Therefore, I concur in the precise holding of Part II, which is that the Court of Appeals erred in interpreting § 703 (h) as a bar, in

every instance, to the award of retroactive seniority relief to persons discriminatorily refused employment after the effective date of Title VII. *Ante,* at 762.

Although I am in accord with much of the Court's discussion in Parts III and IV, I cannot accept as correct its basic interpretation of § 706 (g) as virtually requiring a district court, in determining appropriate equitable relief in a case of this kind, to ignore entirely the equities that may exist in favor of innocent employees. Its holding recognizes no meaningful distinction, in terms of the equitable relief to be granted, between "benefit"-type seniority and "competitive"-type seniority.[1] The Court reaches this result by taking an absolutist view of the "make whole" objective of Title VII, while rendering largely meaningless the discretionary authority vested in district courts by § 706 (g) to weigh the equities of the situation. Accordingly, I dissent from Parts III and IV.

# I

My starting point, as it is for the Court, is the decision last Term in *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405 (1975). One of the issues there was the standards a federal district court should follow in determining whether victims of a discriminatory employment practice should be awarded backpay. The Court began with

---

[1] My terminology conforms to that of the Court, *ante,* at 766. "Benefit"-type seniority refers to the use of a worker's earned seniority credits in computing his level of economic "fringe benefits." Examples of such benefits are pensions, paid vacation time, and unemployment insurance. "Competitive"-type seniority refers to the use of those same earned credits in determining his right, relative to other workers, to job-related "rights" that cannot be supplied equally to any two employees. Examples can range from the worker's right to keep his job while someone else is laid off, to his right to a place in the punch-out line ahead of another employee at the end of a workday.

an observation about the nature of backpay awards and other relief under § 706 (g), the basic remedial section of Title VII:

> "It is true that backpay is not an automatic or mandatory remedy; like all other remedies under the Act, it is one which the courts 'may' invoke. The scheme implicitly recognizes that there may be cases calling for one remedy but not another, and—owing to the structure of the federal judiciary—these choices are, of course, left in the first instance to the district courts." 422 U. S., at 415-416.

Backpay is the only remedy accompanying reinstatement that is mentioned specifically in Title VII. Moreover, as noted below, backpay is a remedy central to achieving the purposes of the Act. The Court in *Albemarle*, recognizing that equitable discretion under § 706 (g) should not be left "unfettered by meaningful standards or shielded from thorough appellate review," 422 U. S., at 416, required of district courts the "principled application of standards [in determining backpay awards] consistent with [congressional] purposes," *id.*, at 417. It identified two distinct congressional purposes implicit in Title VII. The "primary objective" was "prophylactic": " 'to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees.' " *Ibid.*, quoting *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 429-430 (1971). The second purpose was "to make persons whole for injuries suffered on account of unlawful employment discrimination." 422 U. S., at 418. Because backpay served both objectives,[2]

---

[2] As to the prophylactic purpose, the Court stated:

"It is the reasonably certain prospect of a backpay award that 'provide[s] the spur or catalyst which causes employers and unions

the Court concluded that "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.*, at 421.

The Court today, relying upon *Albemarle*'s holding as to the "make whole" purpose of Title VII, reasons that adequate relief for a victim of discrimination ordinarily will require "slotting the victim in that position in the seniority system that would have been his had he been hired at the time of his application." *Ante*, at 765–766. Accordingly, the Court concludes that complete retroactive seniority should be treated like backpay and denied by a district court only for reasons which, applied generally, could not "frustrate" the congressional intent. *Ante*, at 771. Although the Court recognizes important differences between benefit-type seniority and competitive-type seniority, it expressly includes both in its conclusion that seniority relief presumptively should be available.[3] For the reasons that follow, I think the

to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history.'" 422 U. S., at 417–418 (citations omitted).

Backpay furthers the "make whole" purpose of the statute by replacing some of the economic loss suffered as a result of the employer's wrongdoing. See *id.*, at 418–420.

[3] "Discretion is vested . . . to allow the most complete achievement of the objectives of Title VII that is attainable under the facts and circumstances of the specific case. . . . Accordingly, the District Court's denial of *any form* of seniority remedy must be reviewed in terms of its effect on the attainment of the Act's objectives under the circumstances presented by this record." *Ante*, at 770–771 (emphasis added).

Court's holding cannot be reconciled with § 706 (g) or with fundamental fairness.

## II

When a district court orders an award of backpay or retroactive seniority, it exercises equity powers expressly conferred upon it by Congress. The operative language of § 706 (g) states that upon a finding of an unlawful employment practice the district court may enjoin the practice and, further, may

> "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate." 42 U. S. C. 2000e–5 (g) (1970 ed., Supp. IV).

The last phrase speaking to "other equitable relief" was added by a 1972 amendment, Pub. L. No. 92–261, 86 Stat. 103. As noted in *Albemarle, supra,* at 420–421, and again by the Court today, *ante,* at 764, a Section-by-Section Analysis accompanying the Conference Report on that amendment stated that it was Congress' intention in § 706 (g) "to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible." 118 Cong. Rec. 7168 (1972).

The expansive language of § 706 (g) and the 1972 legislative history support a general directive to district courts to grant "make whole" relief liberally and not refuse it arbitrarily. There is nothing in either of those sources, however, to suggest that rectifying economic losses from past wrongs requires the district courts to disregard normal equitable considerations. Indeed, such

a requirement is belied by the language of the statute itself, which speaks of "such affirmative action as may be appropriate" and such "equitable relief as the court deems appropriate." The Section-by-Section Analysis similarly recognized that in fashioning "the most complete relief possible" the court still is to exercise "equitable powers." But in holding that a district court in the usual case should order full retroactive seniority as a remedy for a discriminatory refusal to hire without regard to the effect upon innocent employees hired in the interim, the Court to a significant extent strips the district courts of the equity powers vested in them by Congress.

## III

### A

In *Albemarle Paper* the Court read Title VII as creating a presumption in favor of backpay. Rather than limiting the power of district courts to do equity, the presumption insures that complete equity normally will be accomplished. Backpay forces the employer [4] to account for economic benefits that he wrongfully has denied the victim of discrimination. The statutory purposes and equitable principles converge, for requiring payment of wrongfully withheld wages deters further wrongdoing at the same time that their restitution to the victim helps make him whole.

Similarly, to the extent that the Court today finds a like presumption in favor of granting *benefit*-type seniority, it is recognizing that normally this relief also will be equitable. As the Court notes, *ante*, at 773 n. 33, this type of seniority, which determines pension rights, length of vacations, size of insurance coverage and unemploy-

---

[4] In an appropriate case, of course, Title VII remedies may be ordered against a wrongdoing union as well as the employer.

ment benefits, and the like, is analogous to backpay in that its retroactive grant serves "the mutually reinforcing effect of the dual purposes of Title VII," *ante*, at 767 n. 27. Benefit-type seniority, like backpay, serves to work complete equity by penalizing the wrongdoer economically at the same time that it tends to make whole the one who was wronged.

But the Court fails to recognize that a retroactive grant of *competitive*-type seniority invokes wholly different considerations. This is the type of seniority that determines an employee's preferential rights to various economic advantages at the expense of other employees. These normally include the order of layoff and recall of employees, job and trip assignments, and consideration for promotion.

It is true, of course, that the retroactive grant of competitive-type seniority does go a step further in "making whole" the discrimination victim, and therefore arguably furthers one of the objectives of Title VII. But apart from extending the make-whole concept to its outer limits, there is no similarity between this drastic relief and the granting of backpay and benefit-type seniority. First, a retroactive grant of competitive-type seniority usually does not directly affect the employer at all. It causes only a rearrangement of employees along the seniority ladder without any resulting increase in cost.[5]

---

[5] This certainly would be true in this case, as conceded by counsel for Bowman at oral argument. There the following exchange took place:

"QUESTION: How is Bowman injured by this action?

"MR. PATE [Counsel for Bowman]: By seniority? By the grant of this remedy?

"QUESTION: Either way.

"MR. PATE: It is not injured either way and the company, apart from the general interest of all of us in the importance of the question, has no specific tangible interest in it in this case as

Thus, Title VII's "primary objective" of eradicating discrimination is not served at all,[6] for the employer is not deterred from the practice.

The second, and in my view controlling, distinction between these types of relief is the impact on other workers. As noted above, the granting of backpay and of benefit-type seniority furthers the prophylactic and make-whole objectives of the statute without penalizing other workers. But competitive seniority benefits, as the term implies, directly implicate the rights and expectations of perfectly innocent employees.[7] The eco-

---

to whether seniority is granted to this group or not. That is correct." Tr. of Oral Arg. 42.

In a supplemental memorandum filed after oral argument, petitioners referred to this statement by Bowman's counsel and suggested that he apparently was referring to the competitive aspects of seniority, such as which employees were to get the best job assignments, since Bowman certainly *would* be economically disadvantaged by the benefit-type seniority, such as seniority-related increases in backpay. I agree that in the context Bowman's counsel spoke, he was referring to the company's lack of a tangible interest in whether or not competitive-type seniority was granted.

[6] The Court in *Albemarle* noted that this primary objective had been recognized in *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971). See 422 U. S., at 417; see also *supra*, at 783. In *Griggs*, the Court found this objective to be "plain from the language of the statute." 401 U. S., at 429. In creating a presumption in favor of a retroactive grant of competitive-type seniority the Court thus exalts the make-whole purpose, not only above fundamental principles of equity, but also above the primary objective of the statute recently found to be plain on its face.

[7] Some commentators have suggested that the expectations of incumbents somehow may be illegitimate because they result from past discrimination against others. Cooper & Sobol, Seniority and Testing under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv. L. Rev. 1598, 1605–1606 (1969). Such reasoning is badly flawed. Absent some showing of collusion, the incumbent employee was not a party to the discrimination by the employer. Acceptance of the job

nomic benefits awarded discrimination victims would be derived not at the expense of the employer but at the expense of other workers. Putting it differently, those disadvantaged—sometimes to the extent of losing their jobs entirely—are not the wrongdoers who have no claim to the Chancellor's conscience, but rather are innocent third parties.

As noted above in Part II, Congress in § 706 (g) expressly referred to "appropriate" affirmative action and "other equitable relief as the court deems appropriate." And the 1972 Section-by-Section Analysis still recognized that the touchstone of any relief is equity. Congress could not have been more explicit in leaving the relief to the equitable discretion of the court, to be determined in light of all relevant facts and circumstances. Congress did underscore "backpay" by specific reference in § 706 (g), but no mention is made of the granting of other benefits upon ordering reinstatement or hiring. The entire question of retroactive seniority was thus deliberately left to the discretion of the district court, a discretion to be exercised in accordance with equitable principles.

> "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329–330 (1944).

when offered hardly makes one an accessory to a discriminatory failure to hire someone else. Moreover, the incumbent's expectancy does not result from discrimination against others, but is based on his own efforts and satisfactory performance.

"Moreover, . . . equitable remedies are a special blend of what is necessary, what is fair, and what is workable. . . ." *Lemon* v. *Kurtzman,* 411 U. S. 192, 200 (1973) (opinion of BURGER, C. J.).

"In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests . . . ." *Id.,* at 201.

The decision whether to grant competitive-type seniority relief therefore requires a district court to consider and weigh competing equities. In any proper exercise of the balancing process, a court must consider both the claims of the discrimination victims and the claims of incumbent employees who, if competitive seniority rights are awarded retroactively to others, will lose economic advantages earned through satisfactory and often long service.[8] If, as the Court today holds, the district court may not weigh these equities much of the language of § 706 (g) is rendered meaningless. We cannot assume that Congress intended either that the statutory lan-

---

[8] The Court argues that a retroactive grant of competitive-type seniority always is equitable because it "divides the burden" of past discrimination between incumbents and victims. *Ante,* at 776–777. Aside from its opacity, this argument is flawed by what seems to be a misperception of the nature of Title VII relief. Specific relief necessarily focuses upon the individual victim, not upon some "class" of victims. A grant of full retroactive seniority to an individual victim of Bowman's discriminatory hiring practices will place that person exactly where he would have been had he been hired when he first applied. The question for a district court should be whether it is equitable to place that individual in that position despite the impact upon all incumbents hired after the date of his unsuccessful application. Any additional effect upon the entire work force—incumbents and the newly enfranchised victims alike—of similar relief to still *earlier* victims of the discrimination, raises distinctly different issues from the equity, vis-à-vis incumbents, of granting retroactive seniority to each victim.

guage be ignored or that the earned benefits of incumbent employees be wiped out by a presumption created by this Court.[9]

## B

The Court's concern to effectuate an absolutist conception of "make whole" should be tempered by a recognition that a retroactive grant of competitive-type seniority touches upon other congressional concerns expressed in Title VII. Two sections of the Act, although not speaking directly to the issue, indicate that this remedy, unlike backpay and benefit-type seniority, should not be granted automatically.

The first section, § 703 (h), has been discussed in the Court's opinion. As there noted, the "thrust" of that section is the validation of seniority plans in existence on the effective date of Title VII. The congressional debates leading to the introduction of § 703 (h) indicate a concern that Title VII not be construed as requiring immediate and total restitution to the victims of discrimination regardless of cost in terms of other workers' legitimate expectations. Section 703 (h) does not restrict the remedial powers of a district court once a dis-

---

[9] Indeed, the 1972 amendment process which produced the Section-by-Section Analysis containing the statement of the Act's "make whole" purpose, also resulted in an addition to § 706 (g) itself clearly showing congressional recognition that total restitution to victims of discrimination is not a feasible goal. As originally enacted, §·706 (g) contained simply an authorization to district courts to order reinstatement with or without backpay, with no limitation on how much backpay the courts could order. In 1972, however, the Congress added a limitation restricting the courts to an award to a date two years prior to the filing of a charge with EEOC. While it is true that Congress at the same time rejected an even more restrictive limitation, see *Albemarle Paper Co.* v. *Moody,* 422 U. S., at 420 n. 13, its adoption of any limitation at all suggests an awareness that the desire to "make whole" must yield at some point to other considerations.

criminatory practice has been found, but neither are the concerns expressed therein irrelevant to a court's determination of "appropriate" equitable relief under § 706 (g). Although the Court of Appeals read far too much into § 703 (h), it properly recognized that the section does reflect congressional concern for existing rights under a "bona fide seniority or merit system."

Also relevant is § 703 (j), which prohibits any interpretation of Title VII that would require an employer to grant "preferential treatment" to any individual because his race is underrepresented in the employer's work force in comparison with the community or the available work force.[10] A grant of competitive seniority to an identifiable victim of discrimination is not the kind of preferential treatment forbidden by § 703 (j) but, as counsel for the Steelworkers admitted at oral argument, it certainly would be "preferential treatment." [11] It constitutes a preference in the sense that the victim of

---

[10] Section 703 (j), 78 Stat. 257, 42 U. S. C. § 2000e-2 (j), reads in full as follows:

"(j) Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."

[11] Tr. of Oral Arg. 33.

discrimination henceforth will outrank, in the seniority system, the incumbents hired after the discrimination. Moreover, this is a preference based on a fiction, for the discrimination victim is placed ahead of others not because of time actually spent on the job but "as if" he had worked since he was denied employment. This also requires an assumption that nothing would have interrupted his employment, and that his performance would have justified a progression up the seniority ladder.[12] The incumbents, who in fact were on the job during the interim and performing satisfactorily, would be seriously disadvantaged. The congressional bar to one type of preferential treatment in § 703 (j) should at least give the Court pause before it imposes upon district courts a duty to grant relief that creates another type of preference.

## IV

In expressing the foregoing views, I suggest neither that Congress intended to bar a retroactive grant of competitive-type seniority in all cases,[13] nor that district

---

[12] It is true, of course, that backpay awards and retroactive grants of benefit-type seniority likewise are based on the same fiction and the same assumption. In the case of those remedies, however, no innocent persons are harmed by the use of the fiction, and any uncertainty about whether the victim of discrimination in fact would have retained the job and earned the benefits is properly borne by the wrongdoer.

[13] Nor is it suggested that incumbents have "indefeasibly vested rights" to their seniority status that invariably would foreclose retroactive seniority. But the cases cited by the Court for that proposition do not hold, or by analogy imply, that district courts operating under § 706 (g) lack equitable discretion to take into account the rights of incumbents. In *Tilton* v. *Missouri Pacific R. Co.*, 376 U. S. 169 (1964), and *Fishgold* v. *Sullivan Corp.*, 328 U. S. 275 (1946), the Court only confirmed an express congressional determination, presumably made after weighing all relevant considerations, that for reasons of public policy veterans should receive

courts should indulge a presumption against such relief.[14]
My point instead is that we are dealing with a congressional mandate to district courts to determine and apply equitable remedies. Traditionally this is a balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the trial court. At this time it is necessary only to avoid imposing, from the level of this Court, arbitrary limitations on the exercise of this traditional discretion specifically explicated in § 706 (g). There will be cases where, under all of the circumstances, the economic penalties that would be imposed on innocent incumbent employees will outweigh the claims of discrimination victims to be made entirely whole even at the expense of others. Similarly, there will be cases where the balance properly is struck the other way.

The Court virtually ignores the only previous judicial discussion directly in point. The Court of Appeals for the Sixth Circuit, recently faced with the issue of retro-

---

seniority credit for their time in military service. See 376 U. S., at 174–175. In *Ford Motor Co.* v. *Huffman*, 345 U. S. 330 (1953), the Court affirmed the authority of a collective-bargaining agent, presumably after weighing the relative equities, see *id.*, at 337–339, to advantage certain employees more than others. All I contend is that under § 706 (g) a district court, like Congress in *Tilton* and *Fishgold*, and the bargaining agent in *Huffman*, also must be free to weigh the equities.

[14] The Court, *ante*, at 764 n. 21, suggests I am arguing that retroactive competitive-type seniority should be "less available" as relief than backpay. This is not my position. All relief not specifically prohibited by the Act is equally "available" to the district courts. My point is that equitable considerations can make competitive-type seniority relief less "appropriate" in a particular situation than backpay or other relief. Again, the plain language of § 706 (g) compels careful determination of the "appropriateness" of each "available" remedy in a specific case, and does not permit the inflexible approach taken by the Court.

active seniority for victims of hiring discrimination, showed a fine appreciation of the distinction discussed above. *Meadows* v. *Ford Motor Co.*, 510 F. 2d 939 (1975), cert. pending, No. 74–1349.[15] That court began with the recognition that retroactive competitive-type seniority presents "greater problems" than a grant of backpay because the burden falls upon innocent incumbents rather than the wrongdoing employer. *Id.*, at 949.[16] The court further recognized that Title VII contains no prohibition against such relief. Then, noting that "the remedy for the wrong of discriminatory refusal to hire lies in the first instance *with the District Judge*," *ibid.* (emphasis added), the Court of Appeals for the Sixth Circuit stated:

> "For his guidance on this issue we observe . . . that a grant of retroactive seniority would not depend solely upon the existence of a record sufficient to justify back pay . . . . The court would, in dealing with job [*i. e.*, competitive-type] seniority, need also to consider the interests of the workers who might be displaced . . . . We do not assume . . . that such reconciliation is impossible, but as is obvious, we certainly do foresee genuine difficulties. . . ." *Ibid.*

The Sixth Circuit suggested that the District Court seek

---

[15] From the briefs of the parties it appears that *Meadows* is one of only three reported appellate decisions dealing with the question of retroactive seniority relief to victims of discriminatory hiring practices. In the instant case, of course, the Court of Appeals for the Fifth Circuit held such relief barred by § 703 (h). In *Jurinko* v. *Edwin L. Wiegand Co.*, 477 F. 2d 1038, vacated and remanded on other grounds, 414 U. S. 970 (1973), the Court of Appeals for the Third Circuit ordered the relief without any discussion of equitable considerations.

[16] The Sixth Circuit noted that no equitable considerations stand in the way of a district court's granting retroactive benefit-type seniority. 510 F. 2d, at 949.

enlightenment on the questions involved in the particular fact situation, and that it should allow intervention by representatives of the incumbents who stood to be disadvantaged.[17]

In attempted justification of its disregard of the explicit equitable mandate of § 706 (g) the Court today relies almost exclusively on the practice of the National Labor Relations Board under § 10 (c) of the National Labor Relations Act, 29 U. S. C. § 160 (c).[18]   It is true

---

[17] One of the commentators quoted by the Court today has endorsed the evenhanded approach adopted by the Sixth Circuit: "In fashioning a remedy, . . . the courts should consciously assess the costs of relief to *all* the parties in the case, and then tailor the decree to minimize these costs while affording plaintiffs adequate relief.   The best way to do this will no doubt vary from case to case depending on the facts: the number of plaintiffs, the number of [incumbents] affected and the alternatives available to them, the economic circumstances of the industry."   Poplin, Fair Employment in a Depressed Economy: The Layoff Problem, 23 U. C. L. A. L. Rev. 177, 202 (1975) (emphasis in original); see *id.*, at 224.

Another commentator has said that judges who fail to take account of equitable claims of incumbents are engaging in an "Alice in Wonderland" approach to the problem of Title VII remedies.   See Rains, Title VII v. Seniority Based Layoffs: A Question of Who Goes First, 4 Hofstra L. Rev. 49, 53 (1975).

[18] By gathering bits and pieces of the legislative history of the 1972 amendments, the Court attempts to patch together an argument that full retroactive seniority is a remedy equally "available" as backpay.   *Ante,* at 764–765, n. 21.   There are two short responses.   First, as emphasized elsewhere, *supra,* at 794 n. 14, no one contends that such relief is less *available,* but only that it may be less *equitable* in some situations.   Second, insofar as the Court intends the legislative history to suggest some presumption in favor of this relief, it is irrefutably blocked by the plain language of § 706 (g) calling for the exercise of *equitable* discretion in the fashioning of *appropriate* relief.   There are other responses.   As to the committee citations of lower court decisions and the Conference Report Analysis reference to "present case law," it need only be noted that as of the 1972 amendments no appellate court had considered a

that in the two instances cited by the Court, and in the few others cited in the briefs of the parties,[19] the Board has ordered reinstatement of victims of discrimination "without prejudice to their seniority or other rights and privileges." But the alleged precedents are doubly unconvincing. First, in none of the cases is there a discussion of equities either by the Board or the enforcing court. That the Board has granted seniority relief in several cases may indicate nothing more than the fact that in the usual case no one speaks for the individual incumbents. This is the point recognized by the court in *Meadows*, and the impetus for its suggestion that a representative of their interests be entertained by the district court before it determines "appropriate" § 706 (g) relief.

I also suggest, with all respect, that the Court's appeal to Board practice wholly misconceives the lesson to be

case involving retroactive seniority relief to victims of discriminatory hiring practices. Moreover, the cases were cited only in the context of a general discussion of the complexities of employment discrimination, never for their adoption of a "rightful place" theory of relief. And by the terms of the Conference Report Analysis itself, the existing case law could not take precedence over the explicit language of § 706 (g), added by the amendments, that told courts to exercise *equitable* discretion in granting *appropriate* relief.

Moreover, I find no basis for the Court's statement that the Committee Reports indicated "rightful place" to be the objective of Title VII relief. In fact, in both instances cited by the Court the term was used in the context of a general comment that minorities were still "far from reaching their rightful place in society." S. Rep. No. 92–416, p. 6 (1971). There was no reference to the scope of relief under § 706 (g), or indeed even to Title VII remedies at all.

[19] The respondent Steelworkers cited seven Board decisions in addition to those mentioned in the Court's opinion. Brief for Respondent United Steelworkers of America, AFL–CIO, and for American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae*, 27 n. 31.

drawn from it. In the seminal case recognizing the Board's power to order reinstatement for discriminatory refusals to hire, this Court in a reasoned opinion by Mr. Justice Frankfurter was careful to emphasize that the decision on the type and extent of relief rested in the Board's discretion, subject to limited review only by the courts.

> "But in the nature of things Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review. . . .
>
> ". . . All these and other factors outside our domain of experience may come into play. Their relevance is for the Board, not for us. *In the exercise of its informed discretion the Board may find that effectuation of the Act's policies may or may not require reinstatement.* We have no warrant for speculating on matters of fact the determination of which Congress has entrusted to the Board. All we are entitled to ask is that the statute speak through the Board where the statute does not speak for itself." *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 194–196 (1941) (emphasis added).

The fallacy of the Court's reliance upon Board practice is apparent: the district courts under Title VII stand in the place of the Board under the NLRA. Congress entrusted to their discretion the appropriate remedies for violations of the Act, just as it previously had entrusted discretion to the Board. The Court today denies that

discretion to the district courts, when 35 years ago it was quite careful to leave discretion where Congress had entrusted it. It may be that the district courts, after weighing the competing equities, would order full retroactive seniority in most cases. But they should do so only after determining in each instance that it *is* appropriate, and not because this Court has taken from them the power—granted by Congress—to weigh the equities.

In summary, the decision today denying district courts the power to balance equities cannot be reconciled with the explicit mandate of § 706 (g) to determine "appropriate" relief through the exercise of "equitable powers." Accordingly, I would remand this case to the District Court with instructions to investigate and weigh competing equities before deciding upon the appropriateness of retroactive competitive-type seniority with respect to individual claimants.[20]

---

[20] This is not to suggest that district courts should be left to exercise a standardless, unreviewable discretion. But in the area of competitive-type seniority, unlike backpay and benefit-type seniority, the twin purposes of Title VII do not provide the standards. District courts must be guided in each instance by the mandate of § 706 (g). They should, of course, record the considerations upon which they rely in granting or refusing relief, so that appellate review could be informed and precedents established in the area.

In this case, for example, factors that could be considered on remand and that could weigh in favor of full retroactive seniority, include Bowman's high employee turnover rate and the asserted fact that few victims of Bowman's discrimination have indicated a desire to be hired. Other factors, not fully developed in the record, also could require consideration in determining the balance of the equities. I would imply no opinion on the merits and would remand for full consideration in light of the views herein expressed.