Gregory R. WILSON, et al., Plaintiffs,

v.

SOUTHWEST AIRLINES COMPANY,
Defendant.

Civ. A. No. CA 3-80-0680-G.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 10, 1983.

Donald J. Maison, Jr., Dallas, Tex., for Wilson.

Kenneth Molberg, Wilson, Williams & Molberg, Dallas, Tex., for Peeples.

G. William Baab, Mullinax, Wells, Baab & Cloutman, P.C., Dallas, Tex., for the Union.

Shelton E. Padgett, Manitzas, Harris & Padgett, Inc., San Antonio, Tex., for defendant.

## MEMORANDUM ORDER

FISH, District Judge.

The Transport Workers Union of America, AFL–CIO ("Union") seeks leave to intervene after settlement of this Title VII class action. The motion is opposed by the plaintiff class. The court conducted an evidentiary hearing on the motion on May 27, 1983. For the reasons to be stated, the Union's motion for leave to intervene is GRANTED.

*Procedural Background*

This class action was filed by plaintiff Gregory R. Wilson on June 3, 1980. In his complaint, Wilson alleged that Southwest had been guilty of sex discrimination under Title VII because of its refusal to hire males as flight attendants and ticket agents and because of the disparate impact its 5′9″ maximum height requirement had on the employability of males. By order of February 9, 1981 the court certified a class consisting of "[a]ll males who have applied to Southwest Airlines for a position as flight attendant or ticket agent and were not notified of rejection before March 9, 1979."

After trial of the liability issues (Phase I), the court issued a memorandum order on June 12, 1981.[1] In that opinion, the court held that exclusion of males from the positions in question violated Title VII's prohibition against sex discrimination and was not justified by the bona fide occupational qualification defense. The court also held invalid Southwest's height requirements for flight attendants.

Following the court's decision, the parties entered into negotiations to settle the relief phase of the case. These negotiations commenced during the summer of 1981 and continued for at least seven months. On May 3, 1982, the parties received tentative court approval of a post trial settlement decree. After a hearing, the court approved the proposed decree by order of July 2, 1982, finding it a fair, reasonable and adequate compromise.

*The Union's Right to Intervene*

The Union seeks leave to intervene in this case on the basis of Rule 24(a)(2), Fed.R.Civ.P. According to that rule, the Union is entitled to timely intervention as a matter of right if it meets all three of the following requirements:

1. If it claims an interest relating to the property or transaction which is the subject of the action;

---

1. *Wilson v. Southwest Airlines Co.,* 517 F.Supp. 292 (N.D.Tex.1981).

2. If it is so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and

3. If its interest is not adequately represented by existing parties.

■ Only requirement three is contested by the parties. The Union claims that the seniority rights of its members were not adequately represented before settlement of this case was approved by the court.[2] In reply, the plaintiff class maintains that the Union's position, viz., that only *victims* of discrimination should be awarded retroactive seniority, was adequately represented by Southwest during settlement negotiations.

Because the court was not privy to the negotiations leading up to the proposed settlement, it cannot determine whether Southwest ever objected to the award of retroactive seniority to non-victims. At the July 1982 hearing on the fairness of the settlement, no one mentioned the provision awarding retroactive seniority to non-discriminatees. At the May 27, 1983 evidentiary hearing on the Union's motion to intervene, the only evidence on this issue was the conclusionary statement of plaintiffs' counsel that Southwest had adequately represented the Union's position. This statement did not specifically answer the question whether Southwest ever bargained for the particular right the Union now asserts. Counsel for Southwest represented to the court at the May 27 hearing that it could live with the present decree or as sought to be modified by the Union. Counsel for Southwest also declined to present any wit-

nesses and only briefly cross-examined one of plaintiffs' counsel.[3] Given Southwest's lack of a position at the May 27, 1983 hearing on the issue of retroactive seniority and the court's consequent inability to ascertain whether, during the settlement negotiations, Southwest adequately represented the Union's interest, the court must conclude that the interest of the Union's members in protecting their seniority rights against all persons except victims of discrimination was not adequately represented by Southwest. Thus, the Union has sufficiently established its right to intervene and its motion should be granted if the motion can be considered timely.

### *Timeliness of the Union's Motion to Intervene*

■ Even where a party is entitled to intervene as a matter of right, Rule 24 requires that the application for intervention be timely. The leading case on timeliness under Rule 24 in the Fifth Circuit is *Stallworth v. Monsanto Co.,* 558 F.2d 257 (5th Cir.1977). *See also* the recent case of *Lelsz v. Kavanagh,* 710 F.2d 1040 (5th Cir. 1983). Though timeliness is not limited to chronological considerations but is to be determined from all the circumstances, *Stallworth* establishes four factors as guidelines in determining the timeliness issue. For purposes of clarity, each of these four factors will be discussed separately in connection with the facts of this case.

FACTOR 1: The length of time during which the Union actually knew or reasonably should have known of its inter-

---

**2.** For purposes of the record, evidence was presented at the May 27 hearing that a contractual relationship, i.e., a collective bargaining agreement, exists between the Union and Southwest. *See Stallworth v. Monsanto Co.,* 558 F.2d 257, 268–269 (5th Cir.1977) ("We cannot determine on the present state of the record, however, whether the appellants possess the 'significantly protectable interest' in the subject matter of this case that is necessary to satisfy the first requirement .... If the district court finds that a contractual relation exists between the appellants and Monsanto, then the interest requirement of section (a)(2) is satisfied. The appellants' position would then

be analogous to that of a labor union which seeks to intervene as a defendant in a Title VII suit in order to protect its collective bargaining agreement").

**3.** The court's discussion of whether Southwest adequately represented the Union should not be construed as criticism of counsel for Southwest. Their only duty was to represent Southwest—which they did. The question here is only whether, in their representation of Southwest, counsel also presented and expressed the same position the Union would have expressed if it had been part of the lawsuit.

est in the case before it petitioned for leave to intervene.

Under this factor, the initial date is not when the Union became aware of the suit but the date on which the Union learned *of its interest* in the case. Determination of that date depends on the meaning of "its interest." Simply put, the question is the specificity of the Union's knowledge, actual or constructive, about the pending case before it moved to intervene.

In making this determination, the court is guided by the following language from *Stallworth.*

> [A] rule making knowledge of the pendency of the litigation the critical event . . . would induce both too much and too little intervention. It would encourage individuals to seek intervention at a time when they ordinarily can possess only a small amount of information concerning the character and potential ramifications of the lawsuit, and when the *probability that they will misjudge the need for intervention is correspondingly high.* Often the protective step of seeking intervention will later prove to have been unnecessary, and the result will be needless prejudice to the existing parties and the would-be intervenor if his motion is granted, and purposeless appeals if his motion is denied. In either event, *scarce judicial resources would be squandered, and the litigation costs of the parties would be increased* [emphasis added].

*Stallworth,* above, at 264–265.

The evidence at the May 27 hearing showed that local representatives of the Union were aware of the allegations in plaintiff Wilson's original complaint within a few days after it was filed. Several of them stated at trial that they were in favor of Wilson's efforts to end employment discrimination against males at Southwest. Those efforts were discussed at meetings of the local union and received the support of the members present. The complaint, as originally filed and through its various amendments, did pray for relief in the form of retroactive seniority. The exact wording of the original complaint was "3. Grant to your Plaintiff and *the members of the class* he represents, back pay, front pay, retroactive seniority, compensatory damages, and any and all other necessary equitable and legal relief to compensate each" [emphasis added].

■ The Supreme Court has characterized the Court's task in the relief phase of Title VII litigation as balancing the rights and expectations of innocent employees with the grant of rightful place seniority to *victims* of discrimination. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 372, 97 S.Ct. 1843, 1873, 52 L.Ed.2d 396 (1977); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 777, 96 S.Ct. 1251, 1270, 47 L.Ed.2d 444 (1976). *Teamsters* and its progeny make clear that an award of retroactive seniority flows automatically, with rare exception, after a finding of liability for unlawful discrimination. A court must ordinarily award the remedy of retroactive seniority unless there exist reasons for denying relief which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination and making persons whole for injuries suffered. *Teamsters,* above, 431 U.S. at 365, 97 S.Ct. at 1869. This virtually automatic right to retroactive seniority is to be afforded, however, only to each individual who carries the burden of proof, at the remedy stage, by demonstrating that he has been an actual victim of discrimination.

■ In determining when the Union should have intervened, this court finds three factors significant: (1) from the outset the Union agreed with and supported the position that Southwest discriminated unlawfully against males, which was the ultimate determination of this court; (2) a finding of discrimination would, by the pronouncements of the Supreme Court, mandate retroactive seniority; but (3) any award of retroactive seniority, again by pronouncement of the Supreme Court, should have been afforded only to proven victims of discrimination. The Union contends that, if this suit had followed the predictable path of Title VII litigation, then

it would have accepted the suit's outcome, including an award of retroactive seniority to *victims* of discrimination. The Union argues that it had no obligation to intervene until it learned, sometime after the proposed settlement was approved, that this "predictable path" would not be followed in this case.

The Union's position has some merit,[4] especially in light of the previously emphasized language of *Stallworth.* Although a finding of discrimination was bound to affect the Union's interest in some way, the Union—because of its sympathies with plaintiffs—was apparently willing not to assert its members' interest as against actual victims of discrimination. While the Union's position may also have been motivated by other factors, the court cannot say, under the facts of this case, that Union was bound to intervene in order to contest a position with which it agreed. A rule requiring intervention when any interest of a party is threatened, even when the party has no objection to the invasion of that interest, would, as noted in *Stallworth,* needlessly squander scarce judicial resources and increase litigation costs. Had this lawsuit followed the "norm" in Title VII litigation,[5] any attempt by the Union to intervene, before it knew or should have known that non-victims would be awarded

retroactive seniority, would have been unnecessary, since the Union believed that Southwest was liable and that there was "virtually" no choice about awarding retroactive seniority to discrimination's victims. *See Stallworth,* above, at 267 ("It cannot be said that they ought to have fathomed the potential impact of this admittedly complex case on their seniority rights at some earlier date").

The Union maintains that it did not actually learn of its interest in this lawsuit, as set out above, until its members received a bulletin dated August 12, 1982 from Southwest announcing new seniority rules approved by this court. The court does not agree that August 12 is the relevant date.

Instead, this court holds that July 2, 1982, the date on which the court finally approved the settlement agreement, is the date the Union should have learned about the award of retroactive seniority benefits to non-victims. At that point, the exact terms of the settlement were available. Notices that a settlement hearing would be held on July 2 were published on May 27 and 28, 1982 in the newspapers of several major cities in Texas and other states.[6] In fact, this entire case had received a substantial amount of local, national and international publicity. Under those circumstances, the Union should have known, given its

---

**4.** The court agrees with this position only to the extent that there was no need for the Union to intervene until it should have learned that this litigation had *not* taken the predictable path. See discussion, *infra,* at pages 729 and 730.

**5.** The statements above concerning the "normal" and "predictable path" of Title VII litigation should not be interpreted as a suggestion that the award of retroactive seniority benefits to non-victims of discrimination in the settlement judgment is somehow erroneous. In Title VII litigation, voluntary compliance by private settlement is preferable to court action. Cooperation and voluntary compliance are the preferred means of eliminating unlawful employment discrimination. As the Fifth Circuit has put it: "[t]o the extent that the settlement may in occasional respects arguably fall short of immediately achieving for each affected discriminatee his or her 'rightful place,' we must balance the affirmative action objectives of Title VII and Executive Order 11246 against the

equally strong congressional policy favoring voluntary compliance .... Nor should we substitute our notions of fairness and adequacy of the relief for those of the parties and Judge Pointer, absent a strong showing that the district court failed to satisfy itself of the settlement's overall fairness to beneficiaries and consistency with the public interest." *United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826, 850 (5th Cir.1975).

**6.** The notices were published in the Dallas Morning News, The San Antonio Express and News, the El Paso Times, the Fort Worth Star-Telegram, the Austin American-Statesman, the Amarillo Globe-News, Corpus Christi Caller-Times, the Houston Post, The Midland Reporter-Telegram, The Odessa American, the Lubbock Avalanche-Journal, The Valley Morning Star, the Albuquerque Journal, the Tulsa World, the Oklahoman Times, the Times-Picayune (New Orleans, Louisiana), the Chicago Tribune and The New York Times.

knowledge of the "predictable path" of Title VII litigation, that the settlement agreement might be approved on the date of the hearing or shortly thereafter.

Eighty-four days lapsed between July 2, 1982, the date that the Union should have known of its interest in this lawsuit, and the date on which the motion for intervention was filed. Under the circumstances, the court cannot say that an 84-day delay in seeking intervention justifies a finding that the motion was untimely. *Cf. U.S. By Bell, Etc. v. Allegheny-Ludlum Industries,* 553 F.2d 451, 452–453 (5th Cir.1977) (court denied motion for intervention that was not filed until "nine months after the union and the companies reached the consent agreement with the EEOC and seven and a half months after the district court issued a judgment on the legality of the agreement").

> FACTOR 2: The extent of the prejudice that the existing parties to the litigation may suffer as a result of the Union's failure to apply for intervention as soon as it actually knew or reasonably should have known of its interest in the case.

This factor does not measure the harm to existing parties if intervention is allowed, but rather the prejudice that would result to them from the would-be intervenor's delay in requesting intervention as soon as it knew or reasonably should have known of its interest in the action. Thus, the relevant time period for applying this factor is from July 2, 1982, until September 24, 1982. In evaluating this factor, the focus must be on the prejudice to existing parties resulting from events that occurred during this three-month period.

Plaintiffs' position on prejudice to the existing parties is two-fold. First, they contend that the judgment which the Union seeks to modify was the "product of lengthy and detailed negotiation between the plaintiffs and defendant, comprising some 38 different drafts of proposal." Plaintiffs argue that, if intervention is allowed, the settlement will be "totally undone." If this happens, they say they will

be forced to pursue remedies broader and more favorable to them than those awarded in the settlement decree. They argue, for example, that while the present settlement decree provides only one year of retroactive seniority to male claimants, several members of the class would actually be entitled to many years of retroactive seniority, as much as ten in some instances. According to this argument, if intervention is allowed, plaintiffs would have to insist on the award of more retroactive seniority for those entitled to it than is provided by the settlement decree.

This position confuses the harm to be considered under this factor. Because the prejudice asserted by plaintiffs under this factor is not related to any delay in the Union's intervention, but to any intervention at all, the court concludes that this objection is without merit. *See Lelsz,* above, at 1045 ("In the shortfall the accommodation of additional parties almost invariably slows down litigation and makes it more costly. This alone, however, cannot be a basis for denying intervention of right").

Second, plaintiffs urge that a final judgment has been entered in this case and that all the existing parties have acted in reliance on that final judgment for almost a year. To support this contention, plaintiffs' counsel testified generally that the notice, claim and interview procedures that were afforded to the prospective male flight attendants and ticket agents are almost completed. Specifically, counsel testified that 517 individual notices have been mailed to known applicants, that a total of 228 claims have been submitted, that approximately 172 claimants have received the monetary portion of their settlement claim, that 61 claimants have been interviewed by Southwest, and that an unspecified number of males who have been hired by Southwest and received retroactive seniority have planned their lives based on this judgment.

While it is clear that as of the court's evidentiary hearing on May 27, 1983, the post-settlement aspects of this case had progressed substantially, the court declines to

measure prejudice to plaintiffs as of the date that the court was finally able to conduct an evidentiary hearing on the motion. The Union's motion was filed on September 24, 1982. Plaintiffs filed a response to the motion on October 28, 1982, to which the Union replied on November 8, 1982. On April 18, 1983, this court ordered an evidentiary hearing covering certain specified matters for May 20, 1983. The hearing was postponed by agreement until May 27, 1983. The delay between filing of the Union's motion to intervene and the evidentiary hearing should not be held against the Union. Instead, prejudice to existing parties should be measured as of the date the motion to intervene was filed, on September 24, 1982.

As of September 24, 1982, the settlement judgment had been final only 54 days. Because plaintiffs' testimony at the May 27 hearing concentrated on prejudice as of that date, there is no evidence delineating how far along the presentation and payment of claims and interviewing and hiring procedures were when the Union sought to intervene. Given the short period of time that the judgment had been final, it is doubtful that any substantial progress had been made. Without knowing at least the number of class members who had received monetary settlements, been hired by Southwest and who were already acting in reliance on the one year award of retroactive seniority by September 24, 1982, the court cannot accept plaintiffs' position that the Union's members would experience any more prejudice if intervention had been allowed on September 24, 1982 than the prejudice they would have experienced if intervention had been allowed on July 2, 1982, when the Union should have known of its interest in the lawsuit.

Finally, no evidence was presented that the existing parties would be prejudiced because evidence had been destroyed or because of a significant deterioration in witnesses' memories. *See United Airlines, Inc. v. McDonald,* 432 U.S. 385, 393, n. 14, 97 S.Ct. 2464, 2469, n. 14, 53 L.Ed.2d 423 (1977) ("The ... motion to intervene was filed less than three weeks after the 'settlement' was incorporated in the District Court's final judgment, and necessarily 'concern[ed] the same evidence, memories, and witnesses as the subject matter of the original class suit'.... There is no reason to believe that in that short period of time United discarded evidence or was otherwise prejudiced.").

FACTOR 3: The extent of the prejudice that the Union may suffer if its petition for leave to intervene is denied.

In arguing this factor, plaintiffs have concentrated on the adverse effect that any change in the settlement agreement will have on the Union's members. Plaintiffs' position was summarized in their post-hearing brief: "the limited disruption of seniority resulting from the provision was and is a far smaller imposition than if the alternative remedy had been utilized, namely, full retroactive seniority for all purposes in the cases of male applicants. Such retroactive seniority would have resulted in displacement of employees who had been employed eight to ten years." In essence, plaintiffs are arguing that, if the intervention is allowed, the settlement *will* be set aside and any future judgment, whether by settlement or trial, *will* be significantly less favorable to the Union. It does not follow that if leave to intervene is granted, the settlement will necessarily be set aside; that issue is reserved for decision on the Union's motion to modify the judgment. Furthermore, to give credence to plaintiffs' assertion that any future judgment, if there is such a future judgment, *will* be significantly more detrimental to the Union is to engage in pure speculation. Most importantly, though, plaintiffs position improperly turns the focus away from the true issue: the harm to the Union if it is *not* allowed to intervene.

The harm which the Union has articulated is very general. The Union first contends that job bidding seniority is a significant right at Southwest. From this postulate, the Union argues that "numerous female flight attendants have been placed at competitive disadvantage vis-a-vis more

than fifty (50) male non-discriminatee (sic) who began to work within a year *subsequent* to the time those female flight attendants were hired" [emphasis in original]. No evidence was presented at the hearing, however, that these more than 50 males were in fact non-discriminatees; nor was there any evidence that the 50 plus males were in fact actual victims of discrimination. Without such evidence, the court cannot say one way or the other whether the female flight attendants have been "legally" denied greater seniority, i.e., by proven victims of discrimination, or whether the female flight attendants have been "illegally" denied greater seniority, i.e., by non-victims of discrimination.

Additionally, the Union's position on this factor is flawed in the same way that plaintiffs' position on factors 2 and 3 is flawed. The prejudice suggested by the Union deals with the prejudice its members will suffer if the settlement itself is not set aside. Such an argument is, at this point, premature.

Thus, the court is left only with the Union's generalized statement that its members have been wrongfully denied their rightful place seniority by a significant number of males who are not proven victims of discrimination, an unproven assertion, and that this all occurred without the Union being given an opportunity to be heard. The statement that the Union has not had an opportunity to be heard cannot alone be sufficient under *Stallworth* to justify intervention, for it is axiomatic that any party moving for intervention has not yet been given an opportunity to be heard in this lawsuit. The court is of the opinion that this is not the sort of prejudice that justifies intervention. If such an explanation of prejudice were sufficient, any party would satisfy this requisite merely by filing a motion to intervene, rendering *Stallworth's* third factor meaningless.

However, the court does consider one issue already discussed favorable to the Union, *i.e.,* the inadequacy of representation of its interest. The Fifth Circuit recently stated that "critical to the third *Stallworth*

inquiry is adequacy of representation. If the proposed intervenors' interests are adequately represented, then the prejudice from keeping them out will be slight." *Lelsz,* above, at 1046. The converse is applicable to the present case, for if the Union's interests are not adequately represented the likelihood of prejudice is greater than if its interests were represented. However, the court is not able to determine the extent of the prejudice to the Union solely from its generalized assertions of harm and the fact that its interests are not represented.

    FACTOR 4: The existence of unusual circumstances militating either for or against a determination that the application is timely.

The discussion of this factor in *Stallworth* consisted of only one sentence. It appears that the court intended this factor to be a "catch-all" device. The example given by the Fifth Circuit contemplates that untimeliness in filing a motion to intervene may be excused if the movant offers a "convincing justification for his tardiness." The statement implies that this factor should be given great weight only if the court determines, under the first factor, that a would-be intervenor waited too long to file his petition to intervene *after* he knew or should have known of his interest in the lawsuit. If it has been determined that a party was not, under the circumstances, dilatory in filing his motion when his interest became apparent, resort to this factor in ruling on the motion to intervene does not appear to be necessary. In view of the determination above that the Union filed its motion to intervene relatively soon after it should have known of its interest, the court need not determine whether the Union offered a convincing justification for its tardiness. Additionally, neither the plaintiffs nor the Union argued or presented any evidence of "unusual circumstances."

## Conclusion

The court is aware of the Fifth Circuit's warning in *United States v. United States Steel Corp.,* 548 F.2d 1232, 1235 (5th Cir.

1977) that attempts to intervene after final judgment are "ordinarily looked upon with a jaundiced eye" because they have a strong tendency to prejudice existing parties to the litigation and to interfere substantially with the orderly process of the court. There, however, the would-be intervenors knew about the decree a few days before it was entered but waited a year to intervene. *Id.,* at 1234–1235. This court does not take the Fifth Circuit's statement to mean that intervention after judgment should never be allowed. Even if the Union's attempt to intervene after judgment in this case is viewed with a jaundice eye, intervention should be allowed. The time between the Union's constructive notice of its interest in the suit and the filing of the motion to intervene is not, under the circumstances, inordinately long. The existing parties do not appear to have been prejudiced significantly by the lapse of time between July 2, 1982 and September 24, 1982. Although the extent of prejudice to the Union if intervention is denied cannot be determined, the court is reluctant to conclude that no prejudice will befall the Union if this motion is denied. Overall, the *Stallworth* factors require the court to exercise its discretion in favor of allowing the Union to intervene in this action. As the Fifth Circuit stated so succinctly in *Stallworth:*

> [Though] the district court's determination concerning the advisability of allowing intervention in the second stage is reviewable only for a clear abuse of discretion, ... we merely note this appears to be a classic example of the type of case in which the rights asserted by two groups of workers employed by the same defendant should be adjudicated in one action rather than in two.

*Stallworth,* above, at 269–270.

Accordingly, the motion of the Transport Workers Union of America for leave to intervene is GRANTED, the intervenor's motion to modify judgment and post trial settlement decree is ordered filed, and all parties are directed to confer on the intervenor's motion to modify. The parties shall report the progress of their conference to the court on or before September 12, 1983.