Pamela E. **LONG**, Plaintiff,

v.

**RINGLING BROS.–BARNUM & BAILEY COMBINED SHOWS, INC.,** Defendant.

**Civ. No. AW–91–2927.**

United States District Court, D. Maryland.

May 4, 1995.

Mindy G. Farber and Diane A. Seltzer of Jacobs, Jacobs & Farber, Rockville, MD, for plaintiff.

Jeanne M. Phelan and Robert S. Hillman of Whiteford Taylor & Preston, Baltimore, MD, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAMS, District Judge.

Plaintiff, Pamela E. Long, brought this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), against the Defendant, Ringling Bros.–Barnum & Bailey Combined Shows, Inc., (hereinafter, "Ringling") for sex discrimination based upon an alleged refusal to interview and hire Plaintiff for the position of road controller in Japan solely because she is a female. The Honorable John R. Hargrove, Jr., initially resolved this case by way of summary judgment in favor of Ringling. On appeal, the Fourth Circuit reversed and remanded that decision. *See Long v. Ringling Brothers–Barnum & Bailey,* 9 F.3d 340 (4th Cir.1993).

On September 14, 1994, Judge Hargrove, Jr. reassigned this case to me and on February 28, 1995, the bench trial began. Having listened to and carefully examined all the evidence, observed witnesses, and having heard closing arguments on March 2, 1995, the Court is now ready to address the merits of Plaintiff's claims.

## I. *FACTUAL BACKGROUND AND SUMMARY OF EVIDENCE*

Plaintiff Long is an Asian American female and a resident of Laurel, Maryland. Defendant Ringling presents live entertainment in touring shows and tours around the world. To meet its employment needs, Ringling uses several recruiting firms. One such firm is MBA Management, Inc. ("MBA"). The dispute in this case stems from Ringling's employment need and advertisement for a road controller position in Japan.

Ms. Long applied for the road controller position with Ringling in June 1989. She learned of the position through MBA, with which Ringling had been in contact in its quest to fill the road controller position. At the time, Mark Antalosky was an Account Executive and recruiter with MBA. He drafted a job order consisting of information provided to him by Anne Marie Patton, Engagement Accounting Manager with Ringling. Based upon the information contained in the job order form, MBA subsequently placed an advertisement for the position in the Japanese Embassy's Cultural Center. The job description as advertised provided:

Interested must be fluent in Japanese and have a full knowledge of accounting (A/P, A/R, journal entry, etc.) The job is 90% travel through Japan. Other duties include doing heavy general ledger through financial statements, doing PC work, and constant interfacing with the home office.

The salary is about $30,000, and benefits include free board, free use of a rental car, and paid travel expenses. You will also be in a low tax bracket. Interested persons please contact:

Jessica Davidson
281–2341.

Ms. Long saw the advertisement posted in the Japanese Embassy's Cultural Center. She spoke fluent Japanese, held a master's degree in accounting, had relevant work experience in accounting and personal computer capabilities, and was willing to relocate to Japan, and travel extensively. On June 19, 1989, she personally presented an application and resume to Jessica Davidson, account executive with MBA. Ms. Davidson subsequently provided the materials to Ringling. Ms. Long testified that Ringling never gave her an interview for the position.

On June 20, 1989, Ms. Davidson called Ms. Long at her office to tell her that the man who would be doing the interviewing was out of town on vacation and would not return until the following week. Ms. Davidson indicated that she would follow up with Ms. Long and with Ringling the next week regarding scheduling an interview.

Ms. Davidson on June 22, 1989 faxed Ms. Long's resume to Ann Marie Patton at Ringling, with the following note: "Ann Marie— Here is Pam Long's resume. I will follow up with you on Monday. Have a good weekend. Thanks Jessie." On June 27, 1989, Ms. Davidson again faxed Ms. Long's resume to Ringling. This time, she addressed the transmission to Andy Zion, Ringling's Controller. The message stated, "Andy—I spoke briefly w/Diana—and Ann Marie about Pam. Diana suggested that I fax you her resume. Please let me know one way or the other. Thank you—Jessica."

On June 27, 1989, according to Plaintiff, Ms. Davidson called Plaintiff and told her that "it did not look good" for Ms. Long's prospects for employment at Ringling. When Ms. Long asked her what that meant, Ms. Davidson told her that Ringling did not want to interview her because she was a woman and that Ringling was seeking a man for the position. When Plaintiff requested clarification, Ms. Davidson, purportedly, said that Ringling thought a woman would not be effective in that position because of the cultural bias against women in Japan, and that Ringling was concerned about a woman travelling alone in a foreign country.

Mark Antalosky testified that he executed a Job Order Form for the road controller position advertised by Ringling. He stated that he prepared the form at the direction of Ann Marie Patton, who was then Engagement Accounting Manager with Ringling. She provided him with the relevant information regarding the job, which he then hand wrote onto the form. The job order and the information thereon, which Mr. Antalosky indicated he had received from Ms. Patton, specifically stated that Ringling sought "a male" to fill the position, and that it was looking for someone who had a "good image, not a womanizer." When questioned about why he wrote "a male," Mr. Antalosky testified that he specifically remembered the word male and that Ms. Patton had told him that Ringling preferred a male. Mr. James Mungnolo, the President and owner of MBA, testified that he designed the job order format and that his recruiters (i.e. Antalosky) were trained to execute and accurately fill out the job order form.

Prior to and up to the relevant period of this incident, Ringling had never hired a female road controller for an international show.

Ms. Patton denied expressing to Mr. Antalosky that Ringling preferred a male candidate. She admits, however, the accuracy of some of the information on the job order form, including the desire to hire someone who was not a womanizer. Ms. Patton does not know who placed the job ad (she testified that it was probably Andy Zion, her supervisor) but claims that fluency in Japanese was not essential and that the ad and the job order form incorrectly stated such a requirement. Ms. Patton also disputes some information contained in a letter written by Ringling's corporate attorney, Robert Fleshner, Esq., outlining Ringling's answers in response to questions propounded by EEOC during its investigation. Specifically, Ms. Patton disputes that fluency in Japanese was

important and that Ringling did· not interview anyone who submitted a resume. Ms. Patton testified that she did interview persons (probably at least a female) and may have interviewed Plaintiff, Ms. Long. Finally, Ms. Patton stated that Ringling required extensive training for the road controller position. Although this requirement was not placed on the job order form, Ms. Patton says that the end of May 1989 was the latest that an outside person could be hired because of the extensive (two months) training required of the one who was to assume the road controller position on July 12, 1989, which was the date the ice show began. While she does not remember when the job opening closed, Ms. Patton testified that there was no opening on June 22, 1989 when Plaintiff applied in view of the inability to provide her extensive training in time for the start of the tour.[1] Ultimately, Ringling assigned Jerry Guido, one of its experienced road controllers, to the Japanese ice show· tour. He arrived in Japan around July 10, 1989, two days before the tour began.

Andrew Zino, Ringling's Controller at that time and Ms. Patton's supervisor, testified that fluency in Japanese was important and that the job order description requiring such fluency was accurate.[2] Mr. Zino testified that he did not interview anyone, that he assumed that Ms. Patton placed the ad, and that Ms. Patton made the ultimate hiring decision. Mr. Zino also acknowledged that all road controllers had to be trained but that training varied and did not require a set period. Training, according to Mr. Zino, was based "on the background of the applicant and how fast they could pick it up". Mr. Zino acknowledged that it was possible for the training to be less than two months and could possibly be provided in two weeks— though such would be unusual.

Greg Suzuki, a road ·controller for Ringling, testified for Ringling with reference to the extensive training Ringling provided road controllers in the area of auditing; conducting settlements of expenses, receipts, and royalties; and in preparing and handling payroll and disbursements. While Mr. Suzuki did not have the academic nor the accounting experience when Ringling hired him as compared to Plaintiff, he stated that in his opinion a two month training period was necessary. Mr. Suzuki acknowledged, however that a background similar to Plaintiff's would be helpful and would facilitate understanding. Jerry Guido, a witness for Ringling, stated that there were no set or formal training programs but that there was on-the-job training. When asked whether it was possible for one with 13 years of relevant experience to be trained in three weeks for the road controller position, Guido indicated that it would be difficult, but that it was possible that the required training would be less.

The ice show tour in question arrived in Japan on July 5, 1989 and concluded in October of 1989. When Ringling hired road controllers for a tour it generally employed them permanently and assigned them in the corporate office between shows. The job order provided that the position would lead to more responsibilities in the corporate office. Both the job order and the job ad indicated travel, and other benefits.

## II. *LEGAL STANDARD*

Title VII provides, in pertinent part, that it is unlawful for an employer to refuse to hire any individual because of the individual's sex. 42 U.S.C. § 2000e–2(a). The elements of a *prima facie* case alleging discriminatory treatment in a Title VII case are set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**1.** The Court notes, as it indicated in the February 10, 1995 Memorandum Opinion denying Ringling's motion for summary judgment, that this timeliness argument only recently became a genuine issue and apparently was not seriously raised in either the EEOC proceeding nor during the approximately four years of Court litigation before the United States District Court and the United States Court of Appeals For The Fourth Circuit. This Court will make a finding as to whether Plaintiff made a timely application for the road controller's position.

**2.** The deposition testimony of Jessica Davidson ("and the big thing that I was looking for was someone who would speak Japanese") also supports the testimony of Mr. Zino and disputes Ms. Patton's testimony that fluency in Japanese was not essential.

The Supreme Court stated that the Plaintiff in a Title VII case has the burden of showing "(i) that she is a member of a class protected by Title VII; (ii) that she applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite her qualifications, she was rejected; and (iv) that, after her rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

 Once the Plaintiff establishes a prima facie case, a presumption is created that the employer unlawfully discriminated against the employee. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

"The burden that shifts to the Defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the Plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason. The Defendant need not persuade the Court that it was actually motivated by the proffered reasons ... It is sufficient if the Defendant's evidence raises a genuine issue of fact as to whether it discriminated against the Plaintiff."

*Id.* at 254–255, 101 S.Ct. at 1094–95.

If the employer meets this burden, then the burden shifts back to the Plaintiff to prove that the employer's reasons are false and, instead, serve as a pretext for discrimination. Finally, the Plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her.

### III. *DISCUSSION*

#### A. Liability

 Preliminarily, the Court is satisfied that Plaintiff presented a prima facie case of discrimination under Title VII. Plaintiff, an Asian American female, clearly met the qualifications set forth in the job ad when she applied for the position on June 19, 1989. There was ample testimony and supporting documentation by way of the job order form to conclude that Ringling preferred a male for the road controller position and was looking for a person who had a "good image and not a womanizer". According to Plaintiff Ringling did not interview her, and Jessica Davidson informed Plaintiff that Ringling did not want to interview her because she was a woman and Ringling was looking or seeking a man for the position.

In response to the shifting burden, Ringling maintains that it did not discriminate against Plaintiff because of her gender, but that at the time Plaintiff applied, there was no time to provide her with training to permit her to serve as the road controller on the Japanese tour. In other words, Ringling articulates the untimeliness of Plaintiff's application for the position as its legitimate non-discriminatory reason for not hiring her. Plaintiff contends that Ringling's assertion of untimeliness is false and constitutes a pretext for discrimination. There is no dispute that Jerry Guido, a male who was then employed with Ringling, filled the position.

The Court finds Ringling's non-discriminatory reason for neither interviewing nor employing Plaintiff incredulous. Not only was Ms. Patton unable to state precisely when Ringling closed the position for road controller, but a review of Jessica Davidson's deposition testimony further convinces the Court that the position was still open when Plaintiff applied. Ms. Davidson accepted Plaintiff's resume and application and testified: "Well, I'm sure that I wouldn't have recruited somebody if I didn't think that the job order was open". In addition, Ringling never responded to the two faxed letters or, in any way, advised MBA personnel that the position was no longer open. Moreover, Ringling's own witnesses presented conflicting testimony as to the extent and length of training required in order for Plaintiff to assume the road controller position by July 12, 1989. While Anne Marie Patton testified that Ringling required two month training period for road controllers, Jerry Guido testified that Ringling had no set period for training. He further conceded that the training period could have been shorter for someone of Plaintiff's experience. Even Andrew Zino, Ringling's former Controller, testified that training varied and that Ringling did not have a set period for training.

The Court notes further that neither the ad nor the job order form made any refer-

ence to a two month training period as a prerequisite for employment. Despite Ms. Patton's claims that fluency in Japanese was not essential, that she did not say to Mr. Antalosky that Ringling was looking for a male, that she may have interviewed Plaintiff, and that the position was no longer open when Plaintiff applied because Ringling could not provide her with the two months of training in time for the start of the ice tour on July 12, 1989, the Court believes there is a mound of evidence contradicting Ms. Patton's testimony. The Court, therefore, rejects Ms. Patton's testimony as self-serving and lacking in credibility.

In view of Plaintiff's vast experience in accounting, and her knowledge of personal computers, together with her fluency in Japanese, the Court believes that Ringling could have trained Plaintiff for the road controller position in less than two months and in time to join the tour on July 12, 1989. The Court, specifically, finds that Plaintiff filed her application for the position in a timely manner.

Based upon the Court's review of the entire record, including the testimony and all exhibits, and having assessed the witnesses and their credibility, the Court is persuaded that the evidence establishes that Ringling's reason for not interviewing or hiring Plaintiff was not gender neutral. The Court is convinced and does find that Plaintiff did establish the pretextual nature undergirding Ringling's decision not to hire her.

██ This Court finds that Ringling's explanation (that the application was untimely and that the position was no longer open) for not hiring Plaintiff was pretextual because: (a) the overwhelming evidence, in the opinion of the Court, is that there was no set or rigid two month training period for the position of road controller; (b) there was no mention in the job order form nor in the job ad that a two month training period was required; and (c) with the exception of Ms. Patton's assertion, (advanced for the first time nearly four and a half years after the inception of this litigation), that the position was no longer available on June 19, (or June 22 when Ringling received the fax of the resume) 1989, all other witnesses and evidence convinces this Court that the position was still open when Plaintiff applied.

██ The Court believes that Ringling has articulated no more than an after-the-fact attempt to legitimize an unlawful discriminatory decision not to interview nor employ Plaintiff. The Court further believes that Plaintiff has established that Ringling's alleged legitimate non-discriminatory reason is not worthy of credence. The evidence thoroughly convinces the Court that Plaintiff's academic credentials, work experience, and fluency in Japanese (which the Court finds was essential to the position) made her eminently qualified for an interview and employment. The information on the job order form coupled with the testimony of Plaintiff and Mr. Antalosky establishes, in the opinion of this Court, that Ringling wanted a male and that Plaintiff was rejected because she was a woman. The Court further finds that Ringling has failed to prove and has failed to convince this Court that, notwithstanding the actions by Ringling being motivated by improper gender considerations, Plaintiff could not have obtained this position because of the inability to receive timely training. As mentioned previously, the Court finds that training varied and that time for adequate training was still available. Having rejected Ringling's proffered reason for not interviewing nor hiring Plaintiff, the Court reaches the ultimate conclusion that Ringling's decisions were motivated by intentional discriminatory considerations, and that Plaintiff did prove by a preponderance of the evidence that Ringling intentionally discriminated against her because of her sex/gender.

### B. Damages

██ Under Title VII a prevailing Plaintiff is entitled to "make whole" relief. *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 763, 96 S.Ct. 1251, 1263, 47 L.Ed.2d 444 (1976). This may include the value of fringe benefits. See, e.g., *Crabtree v. Baptist Hosp.,* 749 F.2d 1501 (11th Cir.1985) (permitting recovery of executive retirement benefits); *Kolb v. Goldring, Inc.,* 694 F.2d 869, 873–74 (1st Cir.1982) (ADEA, part of expense account provided to employee for discretionary use); *Walker v. Ford Motor Co.,*

684 F.2d 1355, 1364 (11th Cir.1982) (dicta). Plaintiff clearly is entitled to a back pay award pursuant to 42 U.S.C. § 2000e–5(g). In light of Title VII's policy to make whole a victim of discrimination, the award of back pay should include not only the straight salary, but raises and fringe benefits, as well, which Plaintiff would have received but for the intentional discrimination.

■■■ The Court, therefore, can award Plaintiff back pay and any lost fringe benefits proven from the date she was to assume the position to trial/judgment. This amount should then be offset by Plaintiff's actual earnings and fringe benefits during the same time period. The offset is mandated by the duty under Title VII on Plaintiff to mitigate its back pay award through reasonable and diligent efforts to secure employment. Title VII also authorizes the Court to award reasonable attorney fees to the prevailing party as part of costs.

■■■ In view of the testimony and evidence that road controllers would be provided opportunities to work in Ringling's corporate headquarters at the end of the tour and in between tours, the Court finds that the damages (and the measure thereof) continues to the date of trial. The Court further finds that Plaintiff mitigated her damages and made reasonable, diligent and sufficient efforts to seek and maintain employment during the period from July/August 1989 to February/March 1995.

### 1. Salary/Raises

With reference to the issue of salary and raises, the Court heard testimony from Ms. Patton that the salary range for road controllers to be hired in June/July. of 1989 was between $20–25,000. She indicated that although her supervisor would actually set the salary, Ringling would not have given the person hired any extra salary considerations for his/her experience, and that Ringling had never hired anyone similar in experience as Plaintiff who possessed 13 years of accounting experience. This testimony conflicted with the ad and the job order form which set the salary range around $30,000 per year.

There was evidence that Jerry Guido, who ultimately assumed the road controller position, started in 1986 at a salary of $21,000; that Greg Suzuki (another road controller for Ringling) received a starting salary in 1986 at $24,000; and that Robert Pinard (who was initially selected to assume the road controller position in question) started in 1988 at a salary of $20,000.

■■■ The evidence further reflected that Mr. Pinard received bonuses of $350 in 1989 and $2750 in 1990, and that his annual salary went to $21,000 in 1989 and then to $25,200 in 1990.[3] This represented an approximately 13% annual increase in salary for the two year period of his employment. Mr. Zuzuki, who started with Ringling at $24,000, testified that his salary in 1989 was $32,000 which represented about an 11% annual increase for those three years. While the Court heard and reviewed evidence that bonuses were paid, the Court was not provided an adequate factual basis upon which to reasonably determine the specific amount and extent of bonuses to which Plaintiff would have earned since July/August of 1989. Nevertheless, the Court believes that, but for the discriminatory decision not to hire Plaintiff, Plaintiff qualified for and would have been employed at the announced salary level of $30,000 and would have earned, as did the aforementioned other road controllers, reasonable raises and bonuses. The Court, therefore, finds that an annual salary increase of 10% reasonably compensates Plaintiff for increases and bonuses.

Accordingly, had Ringling hired Plaintiff, her starting salary plus annual ten percent (10%) raises and total lost wages would reflect the following:

| | |
|---|---|
| August 1, 1989—July 31, 1990 | $ 30,000.00 |
| August 1, 1990—July 31, 1991 | $ 33,000.00 |
| August 1, 1991—July 31, 1992 | $ 36,300.00 |
| August 1, 1992—July 31, 1993 | $ 39,930.00 |
| August 1, 1993—July 31, 1994 | $ 43,923.00 |
| August 1, 1994—February 28, 1995 | $ 28,183.93 |
| Total Lost Wages | $211,336.93 |

Plaintiff's employment history and actual salary earned during the period in question can be summarized as follows:

3. Mr. Pinard was terminated on October 12, 1990.

| | |
|---|---|
| August 1, 1989—December 31, 1990 | $ 50,227.00 |
| January 1, 1991—December 31, 1991 | $ 31,782.50 |
| January 1, 1992—December 31, 1992 | $ 31,782.50 |
| January 1, 1993—December 31, 1993 | $ 16,995.74 |
| January 1, 1994—December 31, 1994 | $ 36,250.00 |
| January 1, 1995—February 28, 1995 | $ 6,041.67 |
| Total | $173,079.41 |

Plaintiff is, therefore, entitled to a (net) loss of salary and raises in the amount of $38,257.52.[4]

■ The Court has not been given sufficient reasons to justify front pay, and accordingly, declines to award front pay damages.

2. Fringe Benefits

The Court has spent a great deal of time and energy following the conclusion of the hearing reviewing the testimony, exhibits, and the entire record in an effort to determine the extent, the amount, and the value of fringe benefits Plaintiff is entitled to be awarded as part of her back pay damages. The Court concludes that it is unable to determine the value of fringe benefits with reasonable certainty on the record before it. Preliminarily, the uncontradicted evidence is that the Japanese Tour (which was where Plaintiff would be assigned) would last four (4) months until sometime in October,1989. While it was anticipated that Plaintiff would then be sent to the corporate office to work, there is nothing in the record to support Plaintiff's request for continuous fringe benefits for five and a half years. The Court does not believe that it should guess the value of fringe benefits for four months. Moreover, the record is devoid of what, if any, value of fringe benefits Plaintiff received on her other jobs in mitigation.

■ The Plaintiff claims the value of food from August 1989 to March 1995. The testimony of two road controllers was that road controllers in Japan and while on tour were guaranteed one (1) hot meal by the promoter when there were three shows in a day. On all other occasions, the employees paid for their meals. The Court does not know nor did Plaintiff provide any basis to determine the value of one hot meal. Accordingly, the Court will not award Plaintiff damages for meal expenses.

■ Plaintiff also claims travel (including relocation costs) and transportation costs; however, Plaintiff never made the trip nor incurred expenses, and the testimony indicated and convinced the Court that the promoter provided a bus and, perhaps, a cab when needed, to transport the employees only to and from the hotel to the shows, performances, or both. The Court, therefore, will not award Plaintiff the value of a car rental, and certainly not for five-and-one-half years.

■ The Plaintiff claims board. The testimony was that the road controller was entitled to free board. Plaintiff attempts to itemize her housing expenses on her home in Laurel, Maryland. She suggest that she and her husband would have saved, if hired, over $100,000 in mortgage payments, utilities, water and trash pick-up, and house maintenance. As the Court stated previously, the fringe benefit of free board covered the four month tour. In the absence of evidence that Plaintiff would be on continuous International tour and not spending time in the corporate office (where she would have a normal house note or rental payment) this Court simply has no basis to accept this claim. Moreover, whether and when Plaintiff and her husband would have been able to either sell or quickly lease their house in July at the start of the tour, amounts to no more than sheer speculation.

■ Finally, Plaintiff claims damages for Health and Insurance benefits lost. Again the Court believes that it is unable, on this record, to decipher the actual value of this benefit. This is particularly the case when considering the need to ascertain the deductibles, and the need to compare the actual

---

4. The Court recognizes that the amount earned (including benefits) for the period in question is in dispute. Ringling's position is that Plaintiff earned $205,250.00; Plaintiff's Exhibit V suggests an actual compensatory amount of $141,256.91, however, the Court's review and calculation of the items presented by Plaintiff in Exhibit V comes to $173,079.41. Other evidence presented (e.g. W–2 forms) reflect slightly different amounts of wages earned by Plaintiff for portions of the period in question. This Court finds that the annual amounts presented in Exhibit V reasonably reflect the wages Plaintiff actually earned from August, 1989 to February, 1995. Accordingly, the Court finds the net loss to be $38,257.52.

costs of health coverage to Plaintiff while employed at her several positions as opposed to the health insurance cost at Ringling. In short, the Court does not believe that Plaintiff has shown by a preponderance of the evidence what amount (with a degree of reasonable certainty) of fringe benefits she is entitled to be awarded.

## IV. *FINDINGS OF FACT*

### (SUMMARY)

1. Plaintiff Pamela Long is a Japanese–American female.

2. Plaintiff saw a job listing ad for a road controller in the Japanese Information and Cultural Center in Washington, D.C., in June 1989.

3. Plaintiff responded to the posting on June 19, 1989, by calling Jessica Davidson, who was an account executive with MBA Management, Inc. ("MBA"). MBA is an employment agency with which Ringling had been in contact in its desire to fill the road controller position.

4. Ms. Long and Ms. Davidson met on June 19, 1989 at which time Ms. Davidson interviewed Ms. Long for the position.

5. After reviewing Ms. Long's Data Sheet and resume, Ms. Davidson believed that Ms. Long was a qualified applicant.

6. On June 20, 1989, Ms. Davidson faxed Plaintiff's resume to Ann Marie Patton at Ringling, with the following note: "Ann Marie—Here is Pam Long's resume. I will follow up with you on Monday. Have a good weekend. Thanks Jessie." (Plaintiff's Exhibit J).

7. On June 27, 1989, Ms. Davidson again faxed Ms. Long's resume to Andy Zion [sic], Controller at Ringling. The message stated: "Andy—I spoke briefly w/Diana—and Ann Marie about Pam. Diana suggested that I fax you her resume. Please let me know one way or the other. Thank you—Jessie."

8. On June 27, 1989, Ms. Davidson called Ms. Long and told her that "it did not look good" for Ms. Long at Ringling. When Ms. Long asked her what that meant, Ms. Davidson told her that Ringling did not want to interview her because she was a woman, and that Ringling was seeking a man for the position. When Ms. Long requested clarification of what that meant, Ms. Davidson said that Ringling thought a woman would not be effective in that position because of the cultural bias against women in Japan, and that Ringling was concerned about a woman travelling alone in a foreign country.

9. Plaintiff met all of the job qualifications in that she spoke fluent Japanese, held a master's degree in accounting, had relevant work experience in accounting, and was willing to relocate in Japan and travel extensively.

10. Plaintiff was never interviewed for the position.

11. Mark Antalosky, who was an Account Executive with MBA in 1989, executed a Job Order Form for the road controller position advertised by Ringling. He prepared the form at the direction of Ann Marie Patton, who was then Engagement Accounting Manager with Ringling. She provided him with the relevant information regarding the job, which he then accurately put on the form.

12. The Job Order Form specifically stated that Ringling sought "a male" to fill the road controller position, and that it was looking for someone who had a "good image, not a womanizer."

13. Mr. Antalosky, particularly, remembered that Ms. Patton had told him that she would prefer a male.

14. Ms. Patton admitted that she did tell Mr. Antalosky that Ringling wanted someone who was "not a womanizer."

15. That prior to and throughout the relevant time period, Ringling had never hired a female road controller on an international show.

16. That fluency in Japanese was very important and Plaintiff having been born in Japan spoke fluent Japanese.

17. That the position of road controller was still open when Plaintiff applied on June 22, 1989.

18. That the length of training for the position of road controller varied according to the experience of the person hired and

how quickly the person could learn the system.

19. That based upon Plaintiff's extensive experience in accounting, her fluency in Japanese and her educational background, Plaintiff could have assumed the position of road controller with less than 2 months training.

20. That Plaintiff's application on June 22, 1989 for the position of road controller was timely submitted.

21. That Ringling generally hired its road controllers for permanent positions, and in between shows the road controller worked in the corporate office.

22. That Ringling's decision to not interview or hire Plaintiff for the road controller position was the result of intentional discrimination based upon her gender.

23. Plaintiff would have earned (salary and raises) approximately $211,336.93 from August 1, 1989 to February 28, 1995 had she been employed by Ringling.

24. Plaintiff did actually earn $173,079.41 from August 1, 1989 to February 28, 1995 through other employment.

25. Plaintiff has suffered a total net loss of $38,257.52 in salary and raises for the period in question because of the intentional discrimination by Ringling.

26. Plaintiff has not proven by a preponderance of the evidence nor has Plaintiff established with any degree of reasonable certainty the extent and value of fringe benefits to justify an award of damages for loss of fringe benefits.

## V. *CONCLUSIONS OF LAW*

### A. *JURISDICTION*

1. This action is properly brought by the United States to enforce Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. Ringling discriminated against Pamela E. Long by failing or refusing to interview or employ her as road controller because of her sex in violation of Title VII.

2. The Court has jurisdiction of the subject matter and the parties in this action pursuant to 42 U.S.C. § 2000e–5(f) and 28 U.S.C. § 1345.

3. Venue is properly laid in this District, and all proper, necessary and appropriate parties have been made parties in this civil action.

4. All conditions precedent to the filing of suit have been performed or have occurred.

### B. *BURDEN OF PROOF*

5. A prima facie case of discrimination under Title VII is established by showing that the individual for whom relief is requested is a member of a protected group, was qualified for the job for which she applied, was rejected, and the position was subsequently filed by a person outside of the protected group. Once the Plaintiff establishes a prima facie case of discrimination, Ringling may then articulate a legitimate, non-discriminatory reason for its decision. Finally, the Plaintiff must be accorded an opportunity to show that Ringling's proffered legitimate, non-discriminatory reason or reasons are pretexts for discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Accord Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Pretext can be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

6. A prima facie case of discrimination under McDonnell Douglas, supra, was established at trial: Pamela E. Long is female and therefore a member of a protected group. She was qualified for the road controller position for which she applied. Ms. Long was not hired and Ringling subsequently filled the position with Jerry Guido, a male.

### C. *RINGLING'S PROFFERED EXPLANATIONS ARE PRETEXTUAL*

7. Ringling's reliance on the untimeliness of Plaintiff's application for the position of road controller as a basis to not interview or

hire Plaintiff is an attempt to mask a discriminatory motive. Ringling has failed to offer any legitimate, non-discriminatory reasons for its decisions.

8. In view of Plaintiff's clear qualifications for the position, together with the evidence of Ringling's expressed preference for a male convinces the Court that Plaintiff has demonstrated by a preponderance of the evidence that she was refused an interview and not employed because of her sex.

9. That Ringling's reasons proffered as explanations are pretextual.

### D. *LIABILITY*

10. That Ringling intentionally discriminated against Plaintiff because of her sex.

### E. *RELIEF/DAMAGES*

11. That Plaintiff be awarded damages for loss of back pay in the amount of $38,-257.52.

12. That as the prevailing party, Plaintiff be awarded costs and attorney fees pursuant to 42 U.S.C. § 2000e–5(k) and in accordance with Local Rule 109.1 & 2.